**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA/DANVILLE DIVISION**

| | |
|---|---|
| THE CITY OF CHAMPAIGN, an Illinois municipal corporation, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>McLEODUSA, INC., a Delaware corporation, and McLEODUSA TELECOMMUNICATION SERVICES, INC., an Iowa corporation, )<br>)<br>)<br>Defendants. )<br>) | No. 02-2252<br><br>Hon. Harold Baker |

**MEMORANDUM OF LAW IN SUPPORT OF McLEODUSA'S MOTION
*IN LIMINE* NUMBER 1 TO BAR TESTIMONY OF DAVID L. CLARK,
PURSUANT TO FEDERAL RULES OF EVIDENCE 701 AND 702**

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 16(c) and Local Rule 16.1(E)(5) and (8), defendants McLeodUSA, Inc. and McLeodUSA Telecommunication Services, Inc. (collectively, "McLeodUSA"), by their attorneys, submit this memorandum of law in support of their motion *in limine* for entry of an order barring plaintiff City of Champaign's expert, David L. Clark, from testifying at trial regarding his opinions about the cost of maintaining the City's right-of-way ("ROW") and the reasonableness of the fees the City charged McLeodUSA. The City has disclosed Mr. Clark, an engineer employed by the City, as an expert pursuant to Fed. R. Civ. P. 26(a)(2), and McLeodUSA therefore requests that this Court bar Mr. Clark from testifying about these matters pursuant to Fed. R. Evid. 702 and the standards established by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Mr. Clark's two-page expert report falls dramatically short of the *Daubert* standards. The subject of Mr. Clark's report is the supposed cost that Champaign incurs as a result of McLeodUSA's ROW usage. The purpose of the report is apparently to attempt to show that the fees Champaign seeks against McLeodUSA satisfy the "fair and reasonable" requirement for ROW charges under federal law. 47 U.S.C. § 253(c). But Mr. Clark's "expert opinion" amounts to nothing more than basic arithmetic. Clark has done nothing more than add up entire sections of Champaign's annual budget, and then divide the resulting sum by the 220 miles of ROW in Champaign to compute a "per mile cost" for McLeodUSA's use of the ROW. Using this kitchen-sink approach, Mr. Clark has lumped together *all* of Champaign's costs for concrete, asphalt, and a host of other items -- including municipal recycling programs and the maintenance of the city automobile fleet -- regardless of whether they relate to ROW costs. These calculations are unsupported by any rational economic or accounting method and defy simple common sense. Clark's report and testimony should be excluded.

In addition, because the City offered Mr. Clark's opinions as expert opinions based on technical or specialized knowledge, Clark should be barred from offering the same opinions as a lay witness, pursuant to Fed. R. Evid. Rule 701.

## BACKGROUND

This case concerns ROW fees Champaign has sought to charge against McLeodUSA. Champaign claims that during the years 1998 to 2002, it was entitled to charge McLeodUSA three ROW fees for McLeodUSA's use of the City's ROW under three separate licenses or agreements. (Compl. ¶¶ 34-57.)

McLeodUSA disputes the City's interpretation of the ROW licenses, but its primary defense is that the charges at issue are preempted by the federal Telecommunications

Act of 1996 (the "1996 Act"), which strictly limits the ROW fees that cities may charge. In the 1996 Act, Congress sought to open telecommunications markets to equal competition, and expressly preempted cities from stifling competition by assessing ROW charges that are not: (A) "competitively neutral and nondiscriminatory"; and (B) "fair and reasonable." 47 U.S.C. § 253(c). It is Champaign's burden to establish that its ROW fees meet those requirements. *N.J. Payphone Ass'n, Inc. v. Town of West New York*, 299 F.3d 235, 247 (3d Cir. 2002); *XO Missouri Inc. v. Md. Heights*, 256 F. Supp. 2d 987, 995 (E.D. Mo. 2003).

Courts have interpreted the "fair and reasonable" requirement of 47 U.S.C. § 253(c) to require local governments to show that their fees bear a direct relation to costs imposed on the local government by the carrier's use of the local ROW. *E.g., XO Missouri*, 256 F. Supp. 2d at 993 (fees charged by a municipality must be directly related to a company's use of the local rights-of-way); *N.J. Payphone Ass'n, Inc. v. Town of West New York.*, 130 F. Supp. 2d 631, 637-38 (D.N.J. 2001), *aff'd* 299 F.3d 235 (3d Cir. 2002) ; *PECO Energy Co. v. Township of Haverford*, No. 99-4766, 1999 WL 1240941, at *7 (E.D. Pa. Dec. 20, 1999); *AT&T Communications v. City of Dallas*, 8 F. Supp. 2d 582, 593 (N.D. Tex. 1998). Champaign has proffered Mr. Clark as an expert to offer testimony showing that the City's charges to McLeodUSA satisfy this federal requirement.

In his expert report, Mr. Clark attempts to show that the fees Champaign charged McLeodUSA bear a relationship to the costs incurred by the City as a result of McLeodUSA's use of the ROW, and are therefore "fair and reasonable." Mr. Clark offers three opinions in his report, one of which he modified in his deposition testimony:

>     (A)     Champaign's annual expenditure for asphalt and concrete contract street maintenance for the fiscal years 2002-03 and 2003-04 was $2.8 million. (Ex. 1, Clark Opinion at 1-2.)

    (B)    Given these costs, the fees the City charged McLeodUSA between 1998 and 2002 were "fair and reasonable."

    (C)    A reasonable estimate of the cost of maintaining the 220 miles of ROW in Champaign is $7.23 per foot. (*Id.*) At his deposition, Mr. Clark appeared to reduce this cost estimate to $5.29 per lineal foot. (Exhibit 2, 7/20/04 Clark Dep. at 132.)

Mr. Clark's testimony and opinions are inadmissible under Fed. R. Evid. 702 and the standards established by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) for three reasons. *First*, Mr. Clark's opinions are irrelevant and cannot assist the trier of fact because they are derived from budgets that are largely outside the relevant time frame, and include costs unrelated to McLeodUSA's use of the City's ROW. *Second*, Mr. Clark has no significant accounting, finance, or economic background and cannot reliably testify about how to allocate costs in Champaign's budgets to McLeodUSA's use of the City's ROW. *Third*, Mr. Clark's methodology for concluding that the ROW fees assessed to McLeodUSA were "fair and reasonable" fails to qualify as scientific under *Daubert* and is therefore unreliable. For any one of those reasons, Mr. Clark's testimony should be excluded.

## ARGUMENT

Federal Rule of Evidence 702 bars opinion testimony unless it is based on reliable methodology and would aid the trier of fact. *Daubert*, 509 U.S. at 589-94. In *Daubert*, the Supreme Court held that a district court has a duty to act as a "gatekeeper" to ensure that expert testimony is reliable and relevant before it is admitted. *Id.* at 589 n. 7. Under *Daubert,* expert testimony is not admissible unless: (1) the methodology by which the expert reaches his conclusion is sufficiently reliable; and (2) the testimony assists the trier of fact in understanding the evidence or determining a fact in issue. *Id.* at 591-92. Applying those tests ensures that an expert employs "in the courtroom the same level of intellectual rigor that characterizes the

4

practice of experts in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The *Daubert* standard applies to all purported experts, regardless of their field, *Kumho Tire*, 526 U.S. at 141, including "mathematical" experts. *Otis v. Doctor's Assocs., Inc.*, No. 94 C 4227, 1998 WL 673595, at *4 (N.D. Ill. 1998). And, the proponent of expert testimony "bears the burden of establishing the admissibility of [the expert's] testimony by a preponderance of the evidence." *Id.*

Mr. Clark's testimony cannot satisfy either *Daubert* test. It will not assist the jury because it relates to the wrong time period and counts irrelevant costs. (Section I, below.) And it is unreliable both because Clark is unqualified to give it and because his methodology is unscientific. (Section II, below.)

**I.      Mr. Clark's Testimony Will Not Assist the Trier of Fact.**

*Daubert* requires that the proponent of expert testimony "show that their experts' opinions 'fit' (i.e., have a valid scientific connection to) the issues in this lawsuit so as to assist the fact-finder in understanding the evidence." *Caraker v. Sandoz Pharm. Corp,.* 188 F.Supp. 2d 1026, 1030 (S.D. Ill. 2001); *see also Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 616 (7th Cir. 1993). The key inquiry is whether the testimony "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm. Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand, quoting *Daubert*, 509 U.S. at 597). "An opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse." *Terrell v. Childers*, No. 93 C 2460, 1996 WL 385310, at *10 (N.D. Ill. July 3, 1996) (citation omitted).

Clark's opinions do not "fit" the issues in this lawsuit. To show that its ROW fees between 1998 and 2002 are "fair and reasonable," as required by the 1996 Act, Champaign must show that its ROW charges relate to the specific costs imposed on the City because of McLeodUSA's use of the ROW. *E.g., XO Missouri Inc.*, 256 F. Supp. 2d at 993-95. But Clark's proposed testimony has nothing to do with this inquiry because his calculations are based on fiscal year budgets outside the relevant period and because the budgets Clark uses include multiple irrelevant expenditures that are unrelated to McLeodUSA.

Clark's opinions are based on data from time periods significantly outside the time period relevant to this case. The fees that Clark is supposed to justify were charged during the years 1998 through 2002. Clark's report, however, is based upon cost data from Champaign's Operations and Engineering budgets for fiscal year 2002-03 and fiscal year 2003-04. (Ex. 2, at 29-30.) This data is *two to four years* removed from the relevant period and does not, on its face, reflect the costs expended by the City during the time period at issue. (Ex. 2, at 31; Ex. 3, Shishido-Topel Aff. ¶¶ 14-16; Ex. 1, at 1.) Clark himself acknowledged that pavement maintenance costs are *higher* each year. (Ex. 1, at 1.) Because Clark's calculations start with budget numbers that are admittedly higher than those for the years at issue, his calculations are artificially inflated. (Ex. 3, ¶ 16.; Ex. 1, at 1.) Fundamentally premised on the wrong data, Clark's opinions cannot "logically advance[] a material aspect" of Champaign's case. *Daubert*, 509 U.S. at 591.

Mr. Clark's opinions are also inadmissible because the cost data he uses is grossly over-inclusive. Mr. Clark includes costs that plainly are not caused by McLeodUSA's use of the City's ROW. In his expert deposition, Mr. Clark admitted that the Operations Budget upon which his calculations depend includes expenditures for public parking enforcement, public

6

recycling programs, Champaign's fleet of municipal cars, personnel costs for maintaining city vehicles, road salting, ice removal, and general upkeep of city buildings. (Ex. 2, at 91-104; Ex. 3, ¶ 9.) Those items have virtually nothing to do with a telephone carrier's use of the ROW, and cannot fairly be included in any computation of the costs McLeodUSA imposes on Champaign.[1]

Clark also failed to account for income Champaign may have derived from fees or taxes it charged that may have offset some of the varied items Clark included as costs in his calculations. (Ex. 2, at 125; Ex. 3, ¶ 12; Ex. 4, 4/14/04 Clark Dep. at 19, 126.)

Because Mr. Clark relied upon budgets that were outside the relevant period and included multiple irrelevant expenditures, Champaign cannot meet its burden of establishing that Clark's opinions will help the trier of fact ascertain whether the fees it charged McLeodUSA from 1998 to 2002 were "fair and reasonable." Clark's opinions should therefore be barred under Rule 702.

**II.     Mr. Clark's Opinions are Unreliable.**

Clark's supposed expert opinions should be precluded for the additional and independent reason that his opinions are not reliable. All three of Mr. Clark's opinions fail the *Daubert* reliability test for the same two reasons: (1) Clark is unqualified to offer the opinions; and 2) Clark's methodology is flawed and unscientific.

**A.     Mr. Clark is Unqualified to Offer his Purported Expert Opinions.**

To be reliable, an expert's opinion testimony must be limited to the areas of expertise in which the proffering party can qualify the expert. *E.g., Goodwin v. MTD Prods.,*

---

[1] Clark likewise admitted that the Engineering Budget included in his calculations includes such extraneous items as making maps for the police and fire departments. (Ex. 2, at 109.) In a separate Rule 30(b)(6) deposition, Clark also admitted that the budget includes the costs of environmental stresses and wear and tear unrelated to utilities' presence in the ROW. (Ex. 4, 4/14/04 Clark Dep. at 43.)

*Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (finding that plaintiff's expert, a mechanical engineer, was unqualified to testify as to medical causation). A witness can be qualified as an expert by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. Under Fed. R. Evid. 104(a), a court must examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Although formal degrees or credentials "do not govern by themselves the issue of qualifications, it cannot be denied that these accomplishments aid one in obtaining the requisite knowledge, and thus, are pertinent in determining whether an individual qualifies as an expert." *Virginia Vermiculite v. W.R. Grace & Co.*, 98 F. Supp. 2d 729, 732 (W.D. Va. 2000) (expert unqualified to testify on economic matters where only training was a micro-macro economics course taken long before litigation).

Mr. Clark is unqualified under these standards because he lacks any significant formal training or education in accounting, economics, or finance. Such education or training is necessary because the budget reports on which Clark relies in his report do not show the costs imposed by McLeodUSA, and in his Rule 30(b)(6) deposition, Clark admitted that Champaign has undertaken no calculations or study of what costs McLeodUSA or any other telecommunications carrier might impose. (Ex. 4, at 37.) For those reasons, Clark must use a methodology capable of identifying which specific economic costs in the City's budgets are attributable to use of the City's ROW by carriers and then the portion of those costs that are specifically attributable to McLeodUSA. (Ex. 3, ¶ 5.)

Clark, however, has admitted that he has had no coursework or education in accounting or finance that would have prepared him for such a task. (Ex. 2, at 5-6.) His economics coursework is limited to macro and microeconomics while working on his associate's

8

degree.  In seeking his bachelor's degree, Mr. Clark had also "one class that touched on engineering economics for a couple of weeks." (*Id.* at 5.)  While Clark, an engineer, might be capable of testifying about some aspects of ROW engineering (though he addressed no such issue in his report), he is *not* qualified to provide specific expert testimony about how a single carrier's use of Champaign's ROW impacts costs imposed on the City.

Courts have barred experts with substantially more formal training than Mr. Clark from testifying about an area not directly within their expertise.  *See Marting v. Crawford & Co.*, No. 00 C 7132, 2004 WL 305724, at *3 (N.D. Ill. Jan. 9, 2004) (barring testimony of a professor of human resources regarding the Fair Labor Standards Act).  Clark is an engineer, not an accountant or economist.  The fact that he is knowledgeable about engineering issues does not make him qualified to develop a methodology to allocate costs in a budget to a particular carrier's use of that ROW, let alone opine about whether the fees the City charges to cover these costs are "fair and reasonable."  Expertise in one discipline does not qualify a person to give testimony in another discipline.  *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, No. 99 C 7049, 2004 WL 783075, at *4 (N.D. Ill. Jan. 15, 2004), (barring accountant from testifying about alleged mismanagement of pig purchase contracts, where expert had no skills, knowledge or experience in pig farming); *Terrell*, 1996 WL 385310, at *11 (barring testimony of expert who failed to demonstrate qualification as an expert in the investment advisor field, notwithstanding master's degree in economics, M.B.A. in finance, and college level economics and finance teaching experience.)

In addition to lacking appropriate training, Clark lacks relevant experience. Though Clark has some practical experience in budgeting discreet pavement and maintenance projects within the Engineering Department (Ex. 2, at 18-19), Clark does not seek to testify about

any such discreet project for pavement and maintenance. Rather he proposes to opine about how to allocate costs in the City's *overall* budget to McLeodUSA's use of the ROW, and about whether the fees the City charged to cover those costs were "fair and reasonable" under federal law. Nowhere in his *curriculum vitae* does Clark present any formal experience in accounting, finance, or economics that would qualify him to testify on those subjects. *See Marting*, 2004 WL 305724, at *3; *Terrell*, 1996 WL 385310, at *11.

Clark is also unqualified to offer an opinion about whether Champaign's ROW fees are "fair and reasonable" because that is a legal conclusion under 47 U.S.C. § 253(c). In *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, No. 94 C 50392, 1998 WL 299300, at *2 (N.D. Ill. June 3, 1998), for example, the court barred an expert from offering testimony about the operative date for determining present cash value because while "[t]he actual calculation belongs to the expert, the underlying legal rule does not." *Id.* The Court should similarly bar Mr. Clark from offering testimony that essentially amounts to a legal opinion.

### B. Mr. Clark's Testimony is Unscientific.

Clark's testimony is also unreliable for the independent reason that his conclusions are derived from a flawed and unreliable methodology. *See Kumho Tire*, 526 U.S. at 149-150. Opinion testimony is not admissible under Rule 702 unless it is supported by "sufficient facts or data" and "reliable principles and methods," Fed. R. Evid. 702, and cannot be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

*Daubert* requires courts to bar economic expert testimony based on unreliable data or methodology. In *Target Market Publ'g, Inc. v. ADVO, Inc.,* 136 F.3d 1139, 1143-44 (7th Cir. 1998), for example, the Seventh Circuit upheld the exclusion of a lost profits expert where the expert relied on assumptions and untested internal projections of the plaintiff's financial

10

performance. *See also Sanner v. Board of Trade*, No. 89 C 8467, 2001 WL 1155277, at *7 (N.D. Ill. Sept. 28, 2001) (expert's opinions regarding price effect in futures market inadmissible where opinions were "the result of guesswork and eyeballing"); *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 WL 1506892, at *2 (N.D. Ill. Sept. 21, 2000) (expert barred from testifying about damages where professional economists had never accepted the expert's method nor had the method "been tested against reality"); *Otis*, 1998 WL 673595, at *4 (expert barred from testifying because he had "shown no evidence indicating the methodology the [he] used [was] anything more than an exercise in arithmetic based on inherently unreliable values").

Clark's opinion similarly fails *Daubert* standards and is blatantly unscientific for at least five reasons:

*First*, and most importantly, Clark makes no effort to isolate costs attributable to the use of Champaign's ROW by utility and telephone companies, let alone costs specifically attributable to McLeodUSA. (Ex. 2, at 124, 126). Clark includes costs that plainly are not caused by the use of city ROW by McLeodUSA or any other company, including expenditures for public parking enforcement, public recycling programs, Champaign's fleet of cars, personnel costs for maintaining city vehicles, road salting, ice removal and general upkeep of city buildings, costs of environmental stresses and wear and tear unrelated to utilities. (*Id.* at 91-104, 124-126; Ex. 4, at 43, 53-54, 138-139; Ex. 3, ¶¶ 9-10.) *Compare XO Missouri Inc.*, 256 F. Supp. 2d at 993 (listing relevant costs variables as "the age of the right-of-way, the usage by all utility companies, the access to the right-of-way and the frequency of that access by all utility companies, and the quality of construction of the right-of-way.").

But even if those irrelevant costs are excluded, Mr. Clark cannot figure out which ROW maintenance costs are caused by McLeodUSA. Clark admitted that he has no idea what

the City's "baseline" ROW cost would be without taking into consideration any ROW usage by McLeodUSA or other companies. (Ex. 2, at 81-82, 125-126.) Clark further admitted that he does not know exactly where McLeodUSA's conduit is located in Champaign's ROW, and thus cannot make any specific conclusions about the City's specific costs in those locations. (*Id*. at 82.)

*Second*, and as discussed above, Mr. Clark relies on cost data from the wrong years: fiscal years 2002-03 and 2003-04. (*Id*. at 31.) That data does not reflect the costs expended by the City during the time period at issue, 1998-2002. (Ex. 1, at 1-2; Ex. 2, at 31; Ex. 3, ¶¶ 14-16.) Clark's approach in using data from different years than at issue in this case is inexplicable, and greatly undermines any of his conclusions concerning the relevant period.

*Third*, Mr. Clark fails to account for income the City may have derived from permit fees or taxes that would have offset some of the costs he includes in his calculation. (Ex. 2, at 125; Ex. 3, ¶ 12; Ex. 4, at 19.)

*Fourth*, Mr. Clark does not isolate one-time costs, such as those associated with administering the required permit or inspection repairs, and instead assumes those costs are recurring. (Ex. 3, ¶ 11; Ex. 4, at 36.)

*Fifth*, Mr. Clark has no reliable benchmark against which to compare his conclusions. Mr. Clark apparently calculates that $2 per foot is a reasonable fee because it is the midpoint of a range of fees established throughout the nation. (Ex. 2, at 74-80; Ex. 3, ¶¶ 21-23.) But Clark did not say what fees would be appropriate for McLeodUSA, and he did not establish that McLeodUSA would not qualify for the fees in the lower end of the range of fees. (Ex. 2, at 78-80; Ex. 3, ¶ 23.)

In sum, Mr. Clark has no methodological or empirical basis to attribute the costs that form the basis of his opinions to McLeodUSA's presence in the City's ROW. In the language of economics, Mr. Clark has no method for identifying and allocating incremental costs. (Ex. 3, ¶¶ 17-19 .)

Mr. Clark's testimony presents a classic example of "opinion evidence that is connected to existing data only the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). In that circumstance, a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

### C. The unreliability of Clark's opinion is confirmed by *Daubert's* guideposts.

The unreliability of Mr. Clark's method is virtually self-evident. That conclusion is confirmed by the four guideposts provided in *Daubert* for determining whether an expert's opinions pertain to "scientific knowledge":

> (1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general rate of acceptance of the theory in the scientific community.

*Daubert*, 509 U.S. at 592-594.

Clark's opinions fail to satisfy the <u>first</u> and <u>third</u> requirements for intertwined reasons. First, Clark did not validate the benchmark costs he reviewed from other municipalities, and his theory that they are valid benchmarks is untestable -- he merely asserts that a reasonable fee is one that is equal to or less than these benchmarks. (Ex. 3, ¶¶ 20-21.) *See Terrell*, 1996 WL 385310, at *10 (methodology unscientific where expert did not apply detailed comparison); *Sanner*, 2001 WL 1155277, at *7 (conclusion did not lend itself to verification where there was no evidence that expert conducted any tests other than inspecting charts and graphs generated for his analysis); *Otis*, 1998 WL 673595, at *1-4 (rejecting expert that failed to do any comparative

analysis). Second, Mr. Clark does not assess the known or potential rate of error in his calculations. He knows nothing about the $2 fee he uses as a benchmark. (Ex. 3, ¶ 22.) Mr. Clark derived the benchmark from trade journals containing *conclusions* about access fees and price tables in other cities. Mr. Clark did not testify that those conclusions were based on the same type of methodology he employed, and he did not testify that he saw the underlying data for those conclusions. (Ex. 2, at 137-139.)

Clark's opinions also fail the <u>second</u> *Daubert* test because his method has not been subjected to peer review. Clark has not identified any textbook, accounting guideline or standard that confirms the reliability of the method he used to calculate the costs incurred by Champaign as a result of McLeodUSA's ROW usage. (Ex. 3, ¶ 20.)

Clark's opinions likewise fail the <u>fourth</u> *Daubert* criteria because Clark provides no proof that his average cost measures are directly related to costs caused by McLeodUSA, his conclusions would not be generally accepted in the field of economics. (Ex. 3, ¶¶ 19-20.) *See Vigortone AG Prods., Inc.*, 2004 WL 783075, at *4 (barring expert that could not identify anyone else who employed his methodology); *Terrell,* 1996 WL 385310, at *10; *Otis*, 1998 WL 673595 at *4 (barring expert that did not demonstrate that his method was generally accepted by other experts.)

### III. The Court Should Bar Clark From Offering His Opinions Pursuant to Rule 701.

In the event Clark is not permitted to testify as an expert, Champaign may seek to present Clark's calculations and opinions in the guise of lay testimony. That is impermissible under Fed. R. Evid. 701. A lay witness is limited to giving his opinions on matters that are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the

14

witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701.

Clark's testimony cannot logically meet those requirements. As for the first two requirements, Clark's testimony is based on City budget data, not his own perceptions, and would not be helpful to the "determination of a fact in issue" because it is inherently flawed by miscalculations. (*See* Section I, above.) Moreover, the substance of Clark's testimony, although not unscientific and unreliable, is purportedly based on a technical and specialized area of knowledge. (*See* Section II, above). Further, Clark's ultimate conclusion, that the fee charged McLeodUSA is "fair and reasonable," is not a conclusion that could be based on personal knowledge of a lay person.

A court rejected testimony similar to Clark's in *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 22284326 (N.D. Ill. Oct. 2, 2003), where a television station sought to have their business managers testify, as lay witnesses, that the station would have enrolled a certain number of subscribers in absence of Zenith's breach. The court rejected their testimony because "[a]llowing [] managers to offer their projections relating to future subscribers would permit [the television station] to evade the reliability requirements of expert witnesses 'through the simple expedient of proffering an expert in lay witness clothing,' a strategy that Rule 701 was designed to eliminate." *Id.* at *3 (citing Fed. R. Evid. 701). Clark should similarly be barred from presenting his opinions as a lay witness pursuant to Fed. R. Evid. 701.

## CONCLUSION

For the reasons described above, the City of Champaign cannot meet its burden of demonstrating the admissibility of Mr. Clark's testimony under either Rule 702 or Rule 701.

15

This Court should therefore strike Clark's opinion report and bar Clark from offering any expert or lay opinion at the trial of this matter.

Respectfully submitted,
McLeodUSA Incorporated and
McLeodUSA Telecommunication
    Services, Inc.


By: <u>s/ Edward F. Malone</u>
    One of their attorneys

Edward F. Malone
Daniel J. Weiss
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350
(312) 840-7517 (fax)

October 4, 2004

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)(2)**

Edward F. Malone, attorney for McLeodUSA, certifies that he has complied with the above-referenced rule, and that according to the word processor used to prepare this brief, Microsoft Word, this memorandum contains 4581 words and therefore complies with the type-volume limitation of Local Rule 7.1(B)(2).

        Respectfully submitted,
        McLeodUSA Incorporated and
        McLeodUSA Telecommunication
        Services, Inc.

By:  s/ Edward F. Malone
     One of their attorneys

Edward F. Malone
Daniel J. Weiss
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350
(312) 840-7517 (fax)

October 4, 2004