**E-FILED**
Monday, 04 October, 2004  02:15:12 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA/DANVILLE DIVISION

The City of Champaign, an Illinois
Municipal corporation, on its own behalf and
On behalf of the Class of all other units of
Local government similarly situated,

        Plaintiff,

        v.

MCLEODUSA, INC., a Delaware
Corporation, and McLeodUSA
Telecommunication Services, Inc.,
An Iowa corporation,

        Defendants

No. 02-2252

Hon. Harold Baker

**Affidavit of Lynn Shishido-Topel**

**Lynn Shishido-Topel, having been duly sworn and deposed, states as follows:**

1.    I hold a PhD in economics from the University of California at Los Angeles and I am a Principal at Chicago Partners, LLC, an economics and accounting consulting firm. At Chicago Partners I specialize in the application of economics to legal and regulatory matters. Prior to joining Chicago Partners, I served as a Commissioner on the Illinois Commerce Commission, the state agency that regulates investor-owned utilities including telecommunications services, energy services, and water supply providers in Illinois.

2.    This affidavit is based on my review of a) the June 21, 2004 memorandum from David Clark to Thomas Kelty, setting forth Mr. Clark's expert opinions regarding the costs imposed on the City of Champaign by McLeodUSA's use of the City's right of way ("ROW"), and the reasonableness of the fees the City charges McLeodUSA for use of its ROW ("June 21 Expert Report"); and b) the transcripts of Mr. Clark's April 14, 2004 and July 20, 2004 deposition testimony regarding those opinions (respectively, "April Deposition" and "July Deposition"). If called to testify regarding Mr. Clark's opinions, I would testify as set forth below.

*Mr. Clark Lacks A Reliable Methodology For Allocating Costs In The City's Budget to McLeod.*

3.    In his June 21 Expert Report, Mr. Clark offers opinions about i) the City of Champaign's expenditures on asphalt and concrete maintenance for the last three fiscal years, ii) the cost to the City of maintaining its ROW on a per lineal foot basis, and iii) whether, based on those costs, the fees the City charged McLeodUSA were fair and reasonable.

4.    As I explain in my expert report, in order for these opinions to be relevant under applicable law, Mr. Clark has to estimate which costs in the City's budget are attributable to

2

Affidavit of Lynn Shishido-Topel
October 4, 2004

McLeodUSA's use of the ROW, and whether the fees the city charges McLeodUSA are fair and reasonable in light of the costs attributable to it.

5.    In order for these estimates to be reliable, Mr. Clark needs a methodology for properly identifying which costs in the budget are *caused* McLeodUSA's use of the ROW during the relevant time period. The methodology that Mr. Clark alludes to in his June 21 Expert Report and describes in greater detail in his July deposition cannot properly estimate these costs, or enable Mr. Clark to make a reliable judgment about whether the fees the City charged to McLeodUSA between 1998 and 2002 are fair and reasonable in light of those costs.

6.    As I discuss in greater detail below, the primary shortcomings in Mr. Clark's methodology are:  1) most of the cost data on which he relies is outside of the relevant period of 1998-2002; 2) he includes costs potentially caused by a multitude of activities apart from those related to McLeodUSA's use of the ROW; 3) his maintenance cost estimates are based on estimated annual expenditures, which may be affected from year to year by factors independent of McLeodUSA's presence in the ROW such as weather and funding levels; 4) he does not try to isolate the costs associated with the presence of utilities in the ROW, let alone any specific utilities; 5) he makes incorrect assumptions about the fees charged McLeodUSA, and 6) he has no meaningful empirical benchmark for evaluating the relationship between the costs he identifies and the fees charged to McLeodUSA.

7.    For these reasons, Mr. Clark's methodology is incapable of reliably identifying and allocating the costs in the City's budgets attributable to McLeodUSA's presence in the ROW or the reasonableness of the City's fees. The flaws in Mr. Clark's cost estimates are described below in more detail.

3

Affidavit of Lynn Shishido-Topel
October 4, 2004

*Mr. Clark's Estimate That McLeodUSA Imposes Costs of $7.23 per lineal foot is flawed.*

8.    Mr. Clark's starting point for estimating the costs that McLeodUSA imposed is an estimate that the City's ROW maintenance costs were $7.23 per lineal foot. (June 21 Expert Report, at 1; July Deposition at 62-64) Mr. Clark arrives at the per lineal foot cost with a simple calculation. Mr. Clark first calculates what he considers to be the total annual budget for the City to maintain the ROW ($8.4 million) by adding the estimated total general operating fund expenditures for FY02/03 of $6.1 million to the estimated Public Works Engineering Services fund of $2.3 million for FY 03/04. He then divides this sum by 220 miles (or 1.16 million feet). (June 21 Expert Report, at 1) As I discuss now, the $7.23 per foot estimate contains numerous flaws.

9.    First, Mr. Clark acknowledges that the $7.23 per foot figure contains costs that are not related to the maintenance of the city's ROW. For example, it contains the personnel cost of maintaining some city vehicles, as well as the cost to assign parking tickets, costs for the re-cycling program, and costs for snowplows, road salting, and ice removal. (July Deposition, at 95-104).

10.    Second, as Mr. Clark also acknowledges, his cost estimates include ROW maintenance costs incurred for a multiple of reasons other than those related to the presence of telecommunications companies such as McLeodUSA. His costs include, for example, ordinary wear and tear from traffic and the environment, repair of pavement cuts for city-owned utilities, and costs incurred due to utilities other than McLeodUSA. (April Deposition, at 43, 53-54, 138-139.) In other words, Mr. Clark does not isolate the costs due to utilities in general, much less the incremental costs imposed on the City by McLeodUSA. Indeed, Mr. Clark admits this flaw: Mr. Clark testified that he did not consider any specific utilities costs (July Deposition, at 124) or

Affidavit of Lynn Shishido-Topel
October 4, 2004

4

what component of the ROW maintenance cost would be caused regardless of utility activity in the ROW (July Deposition, at 126).

11.    Third, because Mr. Clark is using his cost estimate as a basis to evaluate the reasonableness of the annual fees assessed to McLeodUSA, he needs to account for the possibility that some costs do not recur on an annual basis, or are paid for by other fees other than the ROW fee. For example, Mr. Clark testified in his April deposition that the costs imposed by firms like McLeodUSA result from administering the required permit, inspecting the firm's work on the right-of-way, inspecting the firm's repairs of the damage caused, and long term maintenance as a result of the damages to the right-of-way. (April Deposition, at 36.) Except for long-term maintenance, these are one-time costs. Mr. Clark does not quantify these costs or account for their one-time nature in his calculations.

12.    Similarly, Mr. Clark does not account for the possibility that these kinds of costs may be paid for upfront by utilities. (July Deposition, at 123.) In his April deposition Mr. Clark acknowledged that privately-owned utilities pay the full costs to repair initial cuts made to bury their facilities. (April Deposition, at 126.) Mr. Clark also testified that utilities pay permit fees. (April Deposition, at 19.) These fees should cover at least some of the costs of administering permits and inspecting the firm's work. Mr. Clark does not, however, quantify these payments or adjust his cost estimates to account for them.

13.    Also, Mr. Clark testified that long-term maintenance (repairs to pavement and sidewalk cuts) is done on average only every 10 years. (April Deposition, at 126-129.) That is, a cut made by McLeodUSA in year one would on average require repair and maintenance in year 10, not every year. It is possible, therefore, that McLeodUSA would not impose long term

5

Affidavit of Lynn Shishido-Topel
October 4, 2004

maintenance costs for all its facilities every year. Mr. Clark does not account for this possibility in his calculations.

14.    Fourth, Mr. Clark does not demonstrate sufficient knowledge about the relevance, appropriateness, or accuracy of some of the underlying cost data that form the basis of his opinions. Consequently, his use of these data is arbitrary and potentially biases his results.

15.    For example, Mr. Clark uses data that do not cover the relevant time period of 1998-2002. Rather, Mr. Clark chooses to use more recent data. (July Deposition, at 31.) The use of the most recent data may not be appropriate here, however, since the issue at hand is whether the fees charged McLeodUSA during the relevant period directly reflects the actual costs imposed by McLeodUSA.. Mr. Clark provides no evidence that the more recent costs he examined provide an accurate estimate of the costs imposed by McLeodUSA during the relevant period.

16.    Indeed, Mr. Clark was aware that the expenditure data he relies on can change over time. For example, he states that costs are higher each year due to inflation. (June 21 Expert Report, at 1.) Also, the data he refers to in his expert report entitled "Summary of Contract Street Maintenance Budget; Staffing and Product" show that expenditures prior to FY00/01 were lower than expenditures in the later periods. Thus, since a later and higher cost estimate allows Mr. Clark to find higher ROW fees fair and reasonable, the use of data outside the relevant time period by Mr. Clark may bias his results in favor of finding fees to be fair and reasonable. Additionally, Mr. Clark's cost calculations are based on total expenditures in fiscal year 2002/03 and 2003/ 04. The level of these expenditures can be affected from year to year by factors independent of the presence of McLeodUSA, such as weather and expected funding levels.

6

Affidavit of Lynn Shishido-Topel
October 4, 2004

*Mr. Clark lacks a reliable method for evaluating whether the fees charged to McLeodUSA were fair and reasonable*

17.     As I explain more fully in my expert report, under applicable law, a fair and reasonable fee in this matter is one that is directly related to the incremental costs imposed by a utility on the City of Champaign. The basis for this definition of a fair and reasonable fee is found in certain court decisions I cite in my report. These take their direction from the Federal Telecommunications Act ("FTA"). However, Mr. Clark bases his conclusions regarding fair and reasonable fees on various measures of average total costs, not on estimates of the incremental costs imposed by McLeodUSA on the City of Champaign.

18.     If Mr. Clark believes his conclusions to be acceptable under applicable law, Mr. Clark must also believe that his measures of average total costs per lineal foot of conduit (including some allocation thereof) are directly related to the incremental costs imposed by McLeodUSA on the City of Champaign.

19.     The equivalence between an average value and an incremental value is not the general case in economic theory. Mr. Clark does not, however, provide any justification or proof that the average total cost measures (that he uses to determine whether the fees charged to McLeodUSA are fair and reasonable) are directly related to the incremental costs imposed by McLeodUSA. These costs also include costs unrelated to McLeodUSA's use of the ROW. Therefore, his conclusion--that the fees charged to McLeodUSA are fair and reasonable--would not be generally accepted in economics.

20.     To my knowledge, Mr. Clark's analysis or similar findings has not been peer reviewed or published in any established journals of economics. Mr. Clark asserts that one of the fees he recalls was charged by other municipalities and published in the trade press is a relevant fair and reasonable benchmark by which to evaluate the fees charged to McLeodUSA. Even if

7

Affidavit of Lynn Shishido-Topel
October 4, 2004

his memory serves him correctly, (Mr. Clark has never documented these recollections) the mere publication of these fees does not establish that the fees provide any information regarding whether the fees charged to McLeodUSA are fair and reasonable. Nor does it validate Mr. Clark's use of his average total cost measures as the basis for his conclusions.

21.    In any case, as evidenced by the variety of benchmark values he proposes (during his July deposition) and his inability to provide evidence that these benchmark values are relevant to the evaluation of the fees charged to McLeodUSA, Mr. Clark does not provide a coherent definition of a fair and reasonable fee for the purposes of this case. Essentially, Mr. Clark simply asserts that a fair and reasonable fee is one that is equal to or less than his various benchmark values without providing a link between the benchmarks and what he believes to be is a fair and reasonable fee for McLeodUSA. As such, Mr. Clark's definition is not meaningfully testable. That is, while one might determine that the fees charged to McLeodUSA were less than one of his benchmarks--say for example, $2 per lineal foot--doing so would not shed any light on the critical question: were they were fair and reasonable?

22.    Mr. Clark fails to assess the known or potential error in his calculations of what is fair and reasonable. For example, Mr. Clark concludes that a fee less than $2 per lineal foot is fair and reasonable based on his recollection that other municipalities charge fees that range from a few cents to $4 or $5. But Mr. Clark does not show why $2 in particular is a reliable estimate of the costs imposed by McLeodUSA, or any utility for that matter, on the City of Champaign. Mr. Clark provides no information regarding how frequently each fee in his recalled range occurs, or how these fees were set (e.g. whether or not the fees are related to actual costs imposed by utilities being charged the fees). Mr. Clark in fact states he does not know which fee in this range McLeodUSA would likely have been charged. (July Deposition, at 78-80.)

Affidavit of Lynn Shishido-Topel
October 4, 2004

8

23.     As such, the appropriate benchmark fair and reasonable fee could be instead the few cents on the low end of Mr. Clark's recalled range of fees, which I understand would be less than the fees charged to McLeodUSA. Based on the information provided by Mr. Clark, each point in his recalled range is equally eligible as a benchmark. Mr. Clark does not, however, recognize or assess the impact of the potential error from only using $2 as a benchmark for a fair and reasonable fee.

24.     Mr. Clark's inclusion of costs not related to maintaining the ROW, the inclusion of costs unrelated to utilities' presence in the ROW, the uncertainty over what costs occur annually, and potential biases in the data all also undermine Mr. Clark's opinion that the fees charged to McLeodUSA were fair and reasonable. But there are additional fundamental flaws I will now discuss.

### *Mr. Clark's "engineering feel" is not a reliable substitute for empirical evidence*

25.     As discussed above, Mr. Clark reaches different answers about the threshold between a fee that is fair and reasonable and one that is not. In his testimony, this changes from a fee that is less than $7.23, to a fee that is less than or equal to 20 percent of $7.23, to a fee that is equal or less than $2, and finally, apparently to a fee that is less than $5.29. (July Deposition, at 63-80, and 127-132.)

26.     Mr. Clark comes to the threshold of 20 percent of $7.23 by noting that 20 percent of $7.23 would be a fair and reasonable fee since 20 percent of $7.23 is $1.45 and it is possible that McLeod USA is in the ROW 20 percent of the time. (July Deposition, at 63-64.)

27.     First, there is no empirical data from Mr. Clark to support this 20 percent number, just "engineering feel." However, this is an empirical issue, not a subjective one. Second, there

9

Affidavit of Lynn Shishido-Topel
October 4, 2004

is no empirical evidence in this case— even if it were true that McLeodUSA was in the ROW 20 percent of the time — that it would contribute 20 percent of the annual maintenance costs. Indeed, Mr. Clark testified that it is not merely being in the ROW that affects costs to the City, but also factors such as thickness or how large the conduit is. (April Deposition, at 29.)

28.     In addition, "engineering feel" or not, the basis for what is fair and reasonable — the $7.23 estimate — still remains unreliable for the reasons described above. The result of applying a 20 percent factor to this cost estimate is therefore also unreliable.

### *Mr. Clark's understanding of the access charged to McLeodUSA is confused and incorrect*

29.     Finally, in evaluating whether the fee McLeodUSA was charged is fair and reasonable, Mr. Clark assumed that that fee is only a per lineal foot access fee of $1.00 or $1.50. (July Deposition, at 86.) But it is my understanding that McLeodUSA was charged per lineal foot access fees of $1.22 and $1.32. In addition, it is my understanding that McLeodUSA was also charged a fee on a per access line basis of $.35. The fee Mr. Clark evaluates therefore conflicts with the fees he describes in his report as "the per lineal foot composite fees for right-of-way use and access line use..." (June 21 Expert Report, at 1), and it conflicts with the ROW fees at issue in this case. As a result, Mr. Clark's opinion that the City's fees were fair and reasonable is uninformative and unreliable.

### *Mr. Clark's alternative $5.29 estimate is also flawed*

30.     At the end of the July deposition, Mr. Clark calculates a new cost estimate of $5.29 per lineal foot that apparently replaces his $2 estimate of a fair and reasonable fee. (July Deposition, at 132.) This cost estimate derives from a different measure of costs than the $8.4

Affidavit of Lynn Shishido-Topel
October 4, 2004

10

million total cost estimate that generates the $7.23 cost per lineal foot estimate. This cost estimate excludes certain cost categories and adds $1.55 million in contract street maintenance expenditures. The resulting sum is divided by 220 miles of ROW to get the $5.29 cost per lineal foot estimate.

31.    Mr. Clark omits some cost categories apparently in order to more specifically measure maintenance costs. (July Deposition, at 130-131.) But the $5.29 cost estimates still suffers from the other flaws described above, which Mr. Clark makes no attempt to address. This cost estimate is therefore inconsistent with applicable law.

32.    In any case, based on his own methodology, Mr. Clark's last minute cost calculation contradicts his opinion that the fees charged to McLeodUSA were fair and reasonable. To be consistent, Mr. Clark would have to apply his 20 percent factor to this cost estimate as he did to the $7.23 cost estimate since the $5.29 estimate continues to contain costs other than those contributed by McLeodUSA.

33.    When applied to $5.29, Mr. Clark's 20 percent methodology produces a fair and reasonable fee threshold of about $1 per lineal foot. It is my understanding that the per lineal foot fees at issue in this case are $1.22 and $1.32 per lineal foot. These fees do not include the $.38 access line fee charged to McLeodUSA.

Lynn Shishido-Topel

Notary

10/04/04
October 4, 2004

"OFFICIAL SEAL"
Laverra A. Lavigne-lopez
Notary Public, State of Illinois
My Commission Exp. 01/13/2006

11

Affidavit of Lynn Shishido-Topel
October 4, 2004