**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA/DANVILLE DIVISION

THE CITY OF CHAMPAIGN, an Illinois )
municipal corporation, )
        Plaintiff, )
 )
    vs. ) NO 02-2252
 )
MCLEODUSA, INC., a Delaware )
corporation, and MCLEODUSA ) Hon. Harold Baker
TELECOMMUNICATION SERVICES, )
INC., an Iowa corporation, )
 )
        Defendants. )

RULE 30(b)(6) DEPOSITION

Deposition of 30(b)(6) Deponent DAVID CLARK, taken at

the instance of the Defendants on the 14th day of

April, 2004, commencing at 9:17 a.m. at Kelty Law

Offices, P.C., 3201 Pleasant Run, Suite A,

Springfield, Illinois, before Cheryl A. Davis,

Certified Shorthand Reporter and Notary Public,

pursuant to Notice of Rule 30(b)(6) Deposition and the

stipulation attached hereto.

DAVIS REPORTING SERVICE
3 Hickory Hills Drive
Springfield, Illinois  62707
(217) 546-6868

Reported by:  Cheryl A. Davis, CSR #084-001662

---

**Page 3**

I N D E X

| WITNESS | PAGE |
|---|---|
| DAVID CLARK | |
| Direct Examination by Mr. Weiss | 5 |
| Cross Examination by Mr. Kelty | 118 |
| Redirect Examination by Mr. Weiss | 125 |

| EXHIBITS | IDENTIFIED |
|---|---|
| Deposition Exhibit 1 | 9 |
| Deposition Exhibit 2 | 75 |

---

**Page 2**

A P P E A R A N C E S

MR. THOMAS W. KELTY
Attorney at Law
Kelty Law Offices, P.C.
3201 Pleasant Run, Suite A
P.O. Box 13317
Springfield, Illinois  62791-3317
Telephone:  217/726-8200

        (Appearing on behalf of the Plaintiff)

MR. DANIEL J. WEISS
Jenner & Block, L.L.P.
One IBM Plaza
Chicago, Illinois  60611-7603
Telephone:  312/222-9350

        (Appearing on behalf of the Defendants)

ALSO PRESENT: Mr. Frederick Stavins

---

**Page 4**

S T I P U L A T I O N

        It is stipulated and agreed, by and between
the parties hereto, through their attorneys, that the
Rule 30(b)(6) deposition of DAVID CLARK may be taken
before Cheryl A. Davis, a Notary Public and Certified
Shorthand Reporter, upon oral interrogatories, on
April 14, 2004, A.D., at 9:17 a.m., at Kelty Law
Offices, P.C., 3201 Pleasant Run, Suite A,
Springfield, Illinois;

        That the oral interrogatories and the
answers of the witness may be taken down in shorthand
by the Reporter and afterwards transcribed;

        That all requirements of the Civil Practice
Act and the Rules of the Supreme Court as to dedimus
are expressly waived;

        That the witness does not waive signature
and shall read and sign this deposition before a
notary public;

        That the deposition or any parts thereof
may be used for any purpose for which Rule 30(b)(6)
depositions are competent, by any of the parties
hereto, without foundation proof;

        That any party hereto may be furnished
copies of the deposition at his or her own expense.

---

Page 17

1 different section of the Engineering Division. He is
2 under the what we call the Development Section of the
3 Engineering Division, and the Development Section is
4 responsible for new developments and issuing permits
5 and monitoring the right-of-ways for new activities,
6 things of that sort.
7     Q. Okay. And as far as you know, when a
8 utility shows up and wants to use the City's
9 rights-of-way and the City requests compensation for
10 that use, who handles that? Who would handle setting
11 the terms of the compensation?
12     A. Well, the City has fees for different
13 permit applications that it's pretty much a set fee.
14 You're asking who determines those fees?
15     Q. Well, not so much the -- let me step back.
16 Do you know this case deals with right-of-way
17 agreements or contracts?
18     A. Uh-huh.
19     Q. Okay.
20     A. Yes.
21     Q. And I'm really asking -- what I'm really
22 asking is do you have any involvement in setting
23 rights-of-way contracts or agreements, licenses?
24     A. The City's legal department is responsible

Page 18

1 for all contracts.
2     Q. Okay.
3     A. On behalf of the City.
4     Q. Okay. The compensation terms that are in
5 those contracts, the rights-of-way contracts,
6 licenses, do you or does your department have any role
7 in setting the compensation terms in those contracts,
8 or is that also the City legal department?
9     A. There's some -- I personally don't have any
10 involvement with that. There may be somebody that has
11 in the past.
12     Q. Okay.
13     A. I don't know who that person would be, but
14 I personally have not done that. I'm not saying that
15 there couldn't be. There could be somewhere, but
16 surely those fees are based on staff rates and
17 inspection times, administrative permits, things like
18 that.
19     Q. Okay.
20     A. Maintenance of the right-of-way. I mean
21 the fees that are charged are, you know, quite low as
22 compared to what's charged and the damages that
23 actually occur out in the right-of-way. When you
24 factor in not only, you know, permit processing and

Page 19

1 administration time and inspection time and
2 eventually, you know, you have to factor in
3 maintenance and damages from utility cuts, things like
4 that. Those fees that are charged are -- when you
5 compare that to those other items, they're quite low
6 actually.
7     Q. Okay. What fees are you talking about when
8 you're saying that they're very low? Just so we're
9 clear.
10     A. The permit fees.
11     Q. The --
12     A. And then any fees that are covered by an
13 agreement with the utility companies that the legal
14 department develops.
15     Q. Okay. So we're talking about two different
16 types of fees: permit fees and then fees under
17 agreements or licenses; right?
18     A. (Witness nods head up and down.)
19     Q. I'm sorry. You've got to say yes or --
20     A. I'm thinking.
21     Q. Oh, I'm sorry. Please think. Take your
22 time.
23     A. I would agree there's two different types
24 of costs, yeah. One's our routine fees that everybody

Page 20

1 pays, and then beyond that there are also legal
2 agreements that may also specify other fees or fees in
3 addition to the standard permit fees and things of
4 that nature.
5     Q. Okay. And as I understand it, this case
6 deals only with fees of the second kind really; the
7 fees that the City is seeking are fees under the legal
8 agreements, and so I want to focus on those types of
9 fees for a minute.
10     A. Yes.
11     Q. Okay? You said those fees are very low I
12 believe. Is that right?
13     A. Yes.
14     Q. Okay.
15     A. From what I know of them, they're pretty
16 low.
17     Q. Okay. Do you know what the fees are under
18 the legal agreements?
19     A. I believe they're somewhere in the
20 neighborhood of $1.00, $1.50 a foot, something of that
21 nature.
22     Q. Do you know of any other types of fees that
23 the City might charge under legal agreements, fees
24 that are not based on a per foot basis?

Page 33

1 to your costs, I mean if a service that's running
2 through there is larger than a smaller service, then
3 that has higher initial costs as well as higher
4 longer-term maintenance costs, and if there is -- you
5 know, there may be some -- well, the size of the
6 facility has long-term costs is what it is.
7    Q. Okay. Let me -- the reason that I'm back
8 on this, you know, your work issue is just because you
9 said that -- in our discussion about the costs you
10 said that the use of the lines doesn't affect your
11 work, and so I'm just trying to, you know, summarize
12 your work. Let me just go at it this way though.
13    I think when you were talking about costs to
14 the City you described, you know, staff time for
15 permits, staff time for construction inspection, staff
16 inspections for damages, repair, and then the fourth
17 thing you described is long-term maintenance. Is the
18 long-term maintenance piece of that, is that your
19 work?
20    A. Yes.
21    Q. Are those the same things?
22    A. Yes, yes.
23    Q. Okay.
24    Quick side note. You mentioned before

Page 34

1 residential right-of-way and commercial right-of-way
2 purchasing. Do you remember that?
3    A. Yes.
4    Q. When you were talking about -- I think for
5 residential it was 3 to 4 and for commercial was 4 to
6 6. Is that right? Do I remember that right?
7    A. Yes.
8    Q. Okay. When you're talking about those
9 rights-of-way purchases, you're talking about
10 purchasing the right-of-way; right?
11    A. Yes.
12    Q. Not annual rental payments on the
13 right-of-way; right?
14    A. Correct.
15    Q. Okay. So when the City goes out and buys
16 residential right-of-way and spends $3 to $4 per foot,
17 that's it. It buys it and then it's done. It doesn't
18 pay $3 to $4 every year; right?
19    A. Correct.
20    Q. Okay, and the same is true on the
21 commercial right-of-way, too; right?
22    A. Correct.
23    Q. Okay. I just wanted to make sure I
24 understood that.

Page 35

1    Let me turn to this 30(b)(6) notice that's
2 been sitting in front of us for awhile because we'll
3 dig into this stuff, and we've already talked about
4 some of it so we'll try and move quickly.
5    Like I said before, we're now looking at
6 Exhibit 1, the Notice of 30(b)(6) Deposition, and,
7 like I said before, I understand you're here for
8 topics 2 and 4. Is that right?
9    A. Right.
10    Q. Okay. I'd like to start with topic 4, and
11 I'm going to read topic 4 into the record just so
12 we're clear on what we're talking about. I'm now
13 quoting the deposition notice. Topic 4: "Each
14 particular cost incurred by Champaign as a result of
15 rights-of-way usage by the defendants, any predecessor
16 of the defendants, Ameritech Illinois, and AT&T during
17 the years 1997 through 2002, and any study,
18 calculation, or review of such costs performed by
19 Champaign." I apologize for the wordiness of the
20 topic, but I wanted to make sure we got everything, so
21 let's talk about this topic No. 4 that you're here to
22 testify to today.
23    What are the particular costs incurred by
24 Champaign as a result of the right-of-way usage by the

Page 36

1 McLeod defendants in the case?
2    A. Well, it gets back to the costs associated
3 with administering a permit which involves, you know,
4 staff time to issue the permit. It involves
5 coordinating with the utility company on their work
6 location. It involves inspecting their work in the
7 right-of-way, inspecting their repairs of the damages
8 that they've caused, and long-term maintenance as a
9 result of the damages to the right -- within the
10 right-of-way.
11    Q. Okay. And we'll talk about those, but let
12 me just ask you, also in the question there's
13 Ameritech Illinois and AT&T in the same question, the
14 costs incurred. Are the categories the same for
15 Ameritech and AT&T, the categories of costs you just
16 outlined?
17    A. The categories are for any utility.
18    Q. Okay. All utilities have these same
19 categories of costs.
20    A. Yes.
21    Q. Okay.
22    Now, are you aware of any study,
23 calculation, or review of these costs that you've
24 outlined with respect to McLeod or the McLeod

Page 37

1 defendants?
2     A.  Could you repeat the question again?
3     Q.  Sure.  I'm now just focusing on the last
4 clause of the question.  I'm asking if you're aware of
5 any study, calculation, or review of the costs, the
6 costs that you've outlined, for McLeod.
7     A.  Well, there's -- we've not done any formal
8 studies to my knowledge, but we do have intentions to
9 review the damages that utilities cause in our
10 right-of-way.  We've been considering this for many
11 years because we know it exists, and I mean it's been
12 -- these issues with utility companies have been
13 happening since the mid '80s, and to my knowledge
14 there's always been a need to do this, to do an
15 examination, a study, to pin down these costs with
16 specific, you know, with specific ties to right-of-way
17 damages: pavement cuts, sidewalk cuts, things like
18 that.
19     Q.  Okay.  But as far as you know, there is no
20 such study, calculation, or review of the costs that
21 may have been imposed by McLeod from say 1998 to
22 2002.  There's no such study or review that exists
23 right now.
24     A.  Not to my knowledge.

Page 38

1     Q.  Okay.  And the same is true for the other
2 carriers, for Ameritech and AT&T?  There's no study,
3 calculation of the specific costs caused by those
4 carriers.
5     A.  We don't have anything -- I mean we are
6 looking at -- going to be looking at these general
7 costs.  I mean all these utility companies have these
8 same costs for damages in the right-of-way, and once
9 we complete the study, it would be applied to all
10 utility companies and not just the ones mentioned.  It
11 would be for anybody and everybody.
12     Q.  And this is a future study the City plans
13 to do.
14     A.  Yeah.  In the very near future actually.
15     Q.  Okay.  But the City so far, you know,
16 before April 14, 2004, the City has not done any such
17 study or calculation.
18     A.  We've been talking about it since the '80s,
19 and it's always been in people's minds that this
20 needed to be done as utility companies that come in
21 and do work to the City and we see the damages out
22 there that are the cause of this, and, you know, other
23 cities throughout the nation are experiencing the
24 same, same issues, and there's been some people, some

Page 39

1 municipalities that have instituted these types of
2 studies, and we're working towards that, doing that
3 same thing.
4     Q.  Okay.  And so if I heard you right, the
5 City has been thinking about or intending to do a
6 study or calculation since the '80s, but the City has
7 not yet done one; right?
8     A.  Correct.
9     Q.  Okay.  And so I want to make sure then
10 that, as I understand it, the City is unable --
11 because it hasn't done this study, the City is unable
12 today to say what the particular dollar costs any
13 specific utility caused over any period of years
14 before 2004.  Is that right?
15     A.  We haven't categorized each -- we haven't
16 put a dollar amount on every little damage that
17 utility companies do.  It's obvious that they do do
18 damages because we have to do maintenance every year.
19 Like I said earlier, we spent 3-1/2 million dollars in
20 annual maintenance last year.
21     Q.  Uh-huh.
22     A.  And part of that is because utility
23 companies come in and they do damages in the
24 right-of-way, and so that -- but there's been -- you

Page 40

1 know, there's been countless numbers of utility
2 companies every year that come in, and that's why we
3 do this maintenance.
4     Q.  And I understand --
5     A.  And so I mean --
6     Q.  Go ahead.
7     A.  -- to say -- you know, it's difficult at
8 this time to say what percentage of that 3-1/2 million
9 dollars is directly tied to utilities, but it's there;
10 it's a real cost.
11     Q.  Uh-huh.
12     A.  That's one of the reasons why we're out
13 there maintaining our infrastructure because utilities
14 come in and they, you know, do their work and leave
15 behind damages that we have to correct for.
16     Q.  And I hear what you're saying.  I
17 understand the City spends a sum, and we could go back
18 and figure out the sum.  The City spends a sum every
19 year on infrastructure maintenance.  You're saying
20 3-1/2 million dollars last year on construction,
21 right?
22     A.  On maintenance.
23     Q.  On maintenance.  Okay.  And what I'm asking
24 is something more specific and that is, has the City

Page 41

1 -- is the City -- let me start over.
2     I think what you're saying is that the City
3 is not able to take that 3-1/2 million and break it
4 out to say that these maintenance costs were incurred
5 because of telephone companies and these maintenance
6 costs were caused by gas companies, or even more
7 specifically down to the actual company level, like
8 Ameritech, McLeod. The City is unable to make those
9 distinctions. Is that right?
10    MR. KELTY: Objection before you answer;
11 compounding the question, mischaracterizing the
12 testimony of the witness. I ask counsel to rephrase
13 the question.
14    MR. WEISS: You can answer the question.
15    A. Could you repeat the question?
16    Q. Sure. I'm asking you if you can break the
17 3.5 million down by utility type or even company-
18 specific name, whether that's possible.
19    A. Sure that's possible; absolutely.
20    Q. How could you do that?
21    A. Well, through the permit process. We know
22 all the utility companies have to come to the City and
23 get a permit. We inspect that work. We know the size
24 of that work. We can come back and say, you know,

Page 42

1 these particular utility companies were occupying this
2 much right-of-way and damaged this much right-of-way
3 and that's contributed to our costs.
4     Q. Let me try and understand that. The City I
5 understand spent 3-1/2 million last year on
6 infrastructure maintenance. Is that right?
7     A. Yes.
8     Q. And I think you've told me that the City
9 has never done a study on the costs that the City has
10 incurred because of particular utilities. Is that
11 right?
12    A. We have not done a study on damages that
13 utilities cause in general.
14    Q. Okay.
15    A. And, as I said, this is an issue happening
16 throughout the nation, and we would be looking at it
17 too. We are going to be looking at it, and it
18 wouldn't matter which utility. Once we complete the
19 study, if you're going to cut our pavement, then this
20 is the cost it's going to be. So, as far as tying
21 that back to the 3-1/2 million last year, sure. I
22 mean we don't have that today, but I'm sure it could
23 be tracked back, backtracked, since all the quantities
24 -- the locations are there; the size of the damage is

Page 43

1 there; our maintenance costs are there. I mean a
2 fairly simple calculation could be done to tie the two
3 together.
4     Q. Well, let me ask you about that. The 3-1/2
5 million you spent on maintenance last year, not all of
6 the 3-1/2 million was attributable to utility
7 companies, was it? I mean don't you have just
8 ordinary maintenance?
9     A. Well, right, right. There's environmental
10 stresses, yeah.
11    Q. Okay.
12    A. Absolutely. There's wear and tear, things
13 like that.
14    Q. And so some piece of the 3-1/2 million, if
15 you had to attribute it, seems to me that you'd
16 attribute it to snow and salt and, you know, just
17 ordinary environmental stuff. Is that right?
18    A. A piece of it, yeah.
19    Q. And would the City ever be able to state
20 what piece of it relates to snow, salt, environment
21 versus utility companies?
22    A. Yes.
23    Q. How would the City be able to do that?
24    A. There's professional engineering firms that

Page 44

1 specialize in pavements, pavement stresses, pavement
2 performance. We keep track -- that could easily do
3 this study. We have our own in-house pavement
4 management report where we keep track of the condition
5 of pavements, and it's essentially a pavement
6 management system, and in addition to normal
7 environmental and traffic stresses on pavements that
8 this management system accounts for, one of the
9 distresses identified in this management system is
10 utility cuts and utility patches.
11    Q. Uh-huh.
12    A. That is a definite deficiency, deduction
13 point, in pavement management systems, and most of our
14 pavement cuts are the result of utilities.
15    Q. Okay.
16    A. So it's easy to tie utility cuts and those
17 right-of-way damages back to costs, real costs.
18    Q. Say you were going to sit down and actually
19 apportion the 3-1/2 million. It sounds to me like you
20 would want to look at utility cuts through the
21 permitting process? Is that what you were saying?
22    A. Well, that's the way we track them. I mean
23 the City has the permit process to help track what
24 activities occur in our right-of-way, and through the

Page 53

1    Q.  Okay, and those are the categories of the
2  costs that the City incurs as a result of utility
3  usage; right?
4    A.  As I see them, yes.
5    Q.  Okay.  The first four as I see it, the
6  permit and then the coordinating the location,
7  inspecting the work, inspecting the repair, those are
8  I think one-time issues; right?  You've got the permit
9  process; you've got the construction, location, and
10  then all that's done.  That doesn't go on year to
11  year; right?
12    A.  Right.
13    Q.  The only cost that you've identified that
14  is a multi-year cost is the long-term maintenance;
15  right?
16    A.  Correct.
17    Q.  And that, I think as you've described it,
18  is essentially the road degradation caused by utility
19  cuts.  Is that right?
20    A.  That's one aspect of it, yes.
21    Q.  What are the other aspects of it?
22    A.  Of maintenance costs?
23    Q.  Yes.
24    A.  Other aspects would be traffic -- damage

Page 54

1  from traffic loadings, environmental stresses, freeze/
2  thaw oxidation, you know, sun damage, to name a few.
3    Q.  Okay, and those are -- and I misunderstood
4  or maybe I misphrased it, but this fifth category,
5  long-term maintenance, you're talking about things
6  that utilities don't cause, like traffic conditions,
7  freezes.  Obviously utilities don't cause the freezes;
8  right?
9    A.  Correct.
10    Q.  The one piece of that that utilities cause
11  are the cuts.
12    A.  Correct.
13    Q.  Okay.  And let me just close out this topic
14  4.  The City right now, today, to your knowledge has
15  never conducted a study or calculation of the actual
16  dollar costs of these categories attributable to any
17  specific utility company.
18    A.  We are beginning -- we've been talking
19  about it, and we are working towards that, that way to
20  do that.  We haven't the completed study, but it's
21  something that we're definitely interested in.
22    Q.  Okay.  It's something the City intends to
23  do in the future but hasn't done yet; right?
24    A.  Has not done it yet.

Page 55

1    Q.  Okay.  Just sort of a side note on this
2  topic 4, Ameritech is part of the topic.  Do you have
3  occasion in your role as civil engineer to come across
4  work done by Ameritech in the City?
5    A.  Absolutely.
6    Q.  Okay.  How often would you say you're
7  dealing with Ameritech and work done by Ameritech?
8    A.  Almost on a weekly basis.
9    Q.  And how does that compare to other
10  telephone companies, not the other gas and water and
11  all those guys, but just the telephone companies?  How
12  does your dealings with Ameritech compare?
13    MR. KELTY:  I object to the form of the
14  foundation.  Compare to what?
15    MR. WEISS:  If you understand the question, you
16  can answer.
17    MR. KELTY:  Do you understand the question?
18    A.  Not really.
19    MR. WEISS:  Okay.
20    A.  I don't totally understand the question.
21    Q.  I'm just asking about telephone companies
22  now, not the other type of utilities, and I'm asking
23  the frequency of your dealings with Ameritech, how do
24  they compare to the frequency of your dealings with

Page 56

1  other telephone companies?
2    A.  Well, my experience is companies are bought
3  and sold, merged.  It changes.  Since I have been at
4  the City we've dealt with several of the different
5  utility companies, but here recently a lot of our work
6  is involved with Ameritech.
7    Q.  Uh-huh.
8    A.  But in the past we've had -- I've had
9  dealings with virtually all of the other utility
10  companies.
11    Q.  Uh-huh.  What I'm wondering is if Ameritech
12  would come up more since it's the historical carrier,
13  the old Maw Bell.
14    A.  It just kind of depends on the project
15  really.  I've had projects that we've had McLeod on;
16  we've had Consolidated Communications on; we've had
17  Ameritech on; we've had Sprint on.  It just happens to
18  be where the project is and what utility is in our --
19  that we're dealing with, so, yeah, we've -- it's hard
20  to quantify how much is one versus the other because,
21  you know, like I say, they merge; they change names.
22  They're bought and sold and depending on the location
23  of the project, you know, what facility it's in, but
24  I've dealt with all of them fairly routinely.

Page 125

1 companies paying the same rate. They're all in the
2 right-of-way, and I would assume that they're all --
3 many of them have -- many of the utility companies
4 have similar agreements, and I would assume that
5 they're all paying the same, same rate.
6    MR. KELTY: That's all I have.
7    MR. WEISS: I've got a little more.
8              REDIRECT EXAMINATION
9 BY MR. WEISS:
10    Q. Just following up on exactly what you left
11 off with, you said you would assume they're all paying
12 the same rate, and I think that's because, and tell me
13 if I'm wrong, that it's because the utility companies,
14 as you understand it, are imposing the same, the same
15 costs on the City. The rate captures how much they're
16 building, but when you get down to each, you know,
17 piece, it's the same cost to the City.
18    A. As far as damages, yes.
19    Q. Okay. Part of when you were talking to
20 Mr. Kelty I didn't understand quite what it was about,
21 about the square yards of concrete. Do you remember
22 that?
23    A. Yes.
24    Q. Can you -- I'm willing to blame myself, but

Page 126

1 I didn't quite follow what it was you were talking
2 about that costs the City that much. Could you
3 explain?
4    A. Part of maintenance involves pavement
5 patches, and that's where you go in and you remove a
6 section of the pavement, and there is a cost to remove
7 and replace that section of pavement, and the costs we
8 were discussing are recent contract unit bid prices
9 for a contractor to go in and replace portions of the
10 pavement. That was the nature of our discussion.
11    Q. Okay. Okay. I think I understand. But if
12 I understand it, with respect to the -- when a utility
13 cuts the road to put their facility in the
14 rights-of-way, the utility is responsible for the
15 initial patching. Is that right?
16    A. Correct.
17    Q. And the City doesn't pay for that. The
18 utility pays for the initial patch; correct?
19    A. Correct.
20    Q. And I think what you're describing are
21 pavement patches that the City does periodically on
22 sections of pavement to have sections of pavement
23 patched. Is that right?
24    A. Correct.

Page 127

1    Q. The City doesn't follow the utilities
2 around and repatch every time a utility puts a road
3 cut in; right?
4    A. Correct.
5    Q. And so when the City is putting in one of
6 these pavement patches, I assume it's to correct or to
7 repair a piece of road that has fallen to disuse --
8 not disuse, but disrepair maybe from several utility
9 cuts, maybe from salt, maybe from a host of
10 environmental factors.
11    A. A number of distresses, yes.
12    Q. Okay.
13    A. And it may or may not include previous
14 patches by utility companies.
15    Q. Yeah. It could include some road cuts by
16 utilities; right?
17    A. It could, yes.
18    Q. And it could include a whole bunch of
19 them. I mean there could be several by several
20 different utilities.
21    A. Oh, yeah.
22    Q. Okay. But there could also be very few or
23 even none, depending on the particular pavement patch
24 the City is doing.

Page 128

1    A. Correct.
2    Q. Okay. How often does the City do a
3 pavement patch like that in a particular location?
4    A. Every year. We have annual maintenance
5 every year.
6    Q. Let me ask it differently. I asked it the
7 wrong way. If the City -- say the City in 2002 did a
8 pavement patch at a particular address. When could I
9 reasonably expect the City to come back and do the
10 same pavement patch in the same exact location? Would
11 it be two years? five years?
12    A. A lot of it depends on how well that patch
13 was put back and as far as other distresses that play
14 on that patch. Hopefully we wouldn't have to come
15 back. Ten years would be soon.
16    Q. Okay.
17    A. To go back and correct a patch.
18    Q. Okay. So the City -- as I understand it,
19 you've got a particular slice of road somewhere, and
20 that particular slice of road encounters different
21 distresses: maybe some cuts; maybe some salt; maybe
22 some heat. The City on a periodic basis does a
23 complete pavement patch, but then the City would not
24 expect to come back and redo that pavement patch for

Page 137

1  Q. Okay.
2  A. So we keep track of that every three years.
3  Q. Okay. So when the City is surveying the
4  streets, it sounds like -- is this a physical survey
5  where people go out and actually --
6  A. Yes.
7  Q. Okay.
8  A. Yes.
9  Q. And so what would be reflected in the
10 system would be that somebody observed some pavement
11 cuts at a certain point in the street. Is that right?
12 A. Yes.
13 Q. But it wouldn't show why those cuts were
14 made, who made those cuts.
15 A. Right. It doesn't -- the system itself
16 does not specify this patch was done by the City, this
17 patch was done by company X, or something like that.
18 It does not put identifiers on the distresses, no.
19 Q. Let me -- you know, I'm close to done, and
20 I promise I'll wrap you up quickly, but let me just
21 ask you one last thing. The City makes pavement cuts;
22 right?
23 A. Yes.
24 Q. Why does the City make pavement cuts?

Page 138

1  A. The City makes pavement cuts to maintain
2  areas of the pavement that have distressed to the
3  point that the distress itself is far greater than the
4  patched repair.
5  Q. So this is in a repairing context the City
6  will cut the pavement.
7  A. Right.
8  Q. Okay. Does the City maintain anything in
9  the rights-of-way, wires or city electric or anything
10 like that?
11 A. Yes.
12 Q. Oh, what does the City maintain in the
13 rights-of-way?
14 A. We maintain storm sewers. We maintain
15 sanitary sewers. We maintain street lights, traffic
16 signal, traffic signal hardware and facilities, things
17 of that nature.
18 Q. And in maintaining the items you just
19 identified, does the City have occasion to make a
20 pavement cut to get in to fix something or change
21 something?
22 A. Occasionally, yes.
23 Q. Okay. And in those cuts, I assume the
24 consequences you've described of pavement cuts by

Page 139

1  utilities, the same consequences would flow from a
2  pavement cut by the City; right?
3  A. Sure.
4  Q. Okay.
5  A. Anybody that cuts the pavement.
6  Q. Okay.
7  A. Whether it be the City or a private
8  industry or whoever.
9  , MR. WEISS: Okay. That's it for me on this
10 round, so thank you again. Let's see if we're done.
11 MR. KELTY: We'll reserve signature.
12 MR. WEISS: We're all done. Thanks very much for
13 your time.
14      (FURTHER DEPONENT SAITH NAUGHT.)
15           (Time concluded: 12:41 p.m.)
16
17
18
19
20
21
22
23
24

Page 140

STATE OF ILLINOIS       )
                        )ss
COUNTY OF SANGAMON      )

3
4           C E R T I F I C A T E
5      I, Cheryl A. Davis, a Notary Public and Certified
6  Shorthand Reporter, do hereby certify that prior to
7  the taking of the deposition herein, and on the 14th
8  day of April, 2004, the Deponent DAVID CLARK was, by
9  me, sworn to testify to the truth in relation to the
10 matter in controversy herein. That on said date the
11 foregoing deposition was taken down in shorthand by me
12 and afterwards reduced to typewritten form by me, and
13 that the foregoing transcript contains a true and
14 accurate translation of all such shorthand notes.
15      Given under my hand and seal this 26th day of
16 April, 2004, at Springfield, Illinois.
17      My commission expires July 6, 2007.
18
19           Notary Public
             Certified Shorthand Reporter
20           License No. 084-001662
21
22
23
24