IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA/DANVILLE DIVISION

| | |
|---|---|
| THE CITY OF CHAMPAIGN, an Illinois municipal corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 02-2252 |
| McLEODUSA, INC., a Delaware corporation, and McLEODUSA TELECOMMUNICATION SERVICES, INC., an Iowa corporation, | ) ) ) Hon. Harold Baker ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF McLEODUSA'S
<u>MOTION *IN LIMINE* NUMBER 3 TO BAR PAROL EVIDENCE</u>**

Pursuant to Fed. R. Civ. P. 16(c) and Local Rule 16.1(E)(5)(8), defendants, McLeodUSA, Inc. and McLeodUSA Telecommunication Services, Inc. (collectively "McLeod") by their attorneys, submit this memorandum of law in support of their motion *in limine* for entry of an order barring plaintiff from submitting parol evidence to contradict the plain meaning of certain terms of two of the contracts at issue in this lawsuit.

**Introduction**

In this case, the City seeks to charge duplicate fees to McLeodUSA under three different rights-of-way ("ROW") contracts. However, a substantial amount of the City's monetary claims are barred by the plain terms of two of those three contracts. The 1996 agreement between Champaign and McLeodUSA's predecessor, Consolidated Communications Telecom Services, Inc. ("CCTS"), unambiguously superseded and replaced the fee arrangement contained in the prior 1994 agreement between the City and CCTS's predecessor, Consolidated

Network, Inc. ("CNI"). Under the plain terms of the 1996 contract, the 1994 agreement does not apply in this case.

Similarly, while the City seeks to recover fees for over 60,000 feet of conduit under the 1997 agreement between the City and McLeodUSA, the plain terms of that agreement limit the scope of the contract to 20,982 feet of conduit expressly covered by the agreement. The remaining conduit is covered by the 1996 Agreement under its plain terms.

Because the plain terms of the agreements defeat those aspects of Champaign's claims, McLeodUSA anticipates that the City will seek introduce parol evidence, including testimony by City Attorney Frederick Stavins and certain documentary evidence, in an attempt to contradict the contracts' plain meaning. That effort would be impermissible under Illinois law and the Federal Rules of Evidence. Because Illinois law bars parol evidence where a contract is unambiguous, the introduction of evidence purporting to contradict the plain terms of the 1996 and 1997 contracts is inadmissible as irrelevant and potentially confusing under Rules 402 and 403.[1]

## Background

This case concerns Champaign's claims that McLeodUSA must pay three different ROW charges to the City for McLeodUSA's use of Champaign's ROW. McLeodUSA, like other telephone companies, uses city ROW (such as space under streets) to place equipment in order to serve its customers. Champaign claims that during the years 1998 to 2002, it was entitled to charge McLeodUSA three ROW fees under three separate contracts.

---

[1] McLeod has also filed a Pre-trial Motion Regarding the Non-Application of the 1994 Agreement that seeks a ruling on whether the fee provision of the 1994 Agreement was superseded by the 1996 Agreement as a matter of law. This motion seeks a ruling on the related evidentiary issue of whether parol evidence about that issue is admissible.

Although McLeodUSA's primary defense to Champaign's claims is that these fees are preempted by Section 253 of the Telecommunications Act of 1996 (the "1996 Act"), 47 U.S.C. § 253, McLeodUSA also disputes Champaign's interpretation of the 1996 and 1997 contracts. These two agreements unambiguously limit McLeodUSA's financial obligations to Champaign for use of its ROW to amounts well below those claimed by the City.

**The 1994 CNI Agreement.**

The first agreement that Champaign seeks to apply against McLeodUSA in this case is a 1994 agreement between CNI and Champaign (the "1994 Agreement"). (Compl. ¶¶ 34-44.) A true and correct copy of the 1994 Agreement is attached hereto as Exhibit A. Champaign and CNI executed the 1994 agreement in July 1994. (Ex. A at 9; Compl. ¶ 35.) The 1994 Agreement provided that CNI would pay Champaign a ROW fee in exchange for a license to maintain a telecommunications conduit in Champaign's ROW. (Ex. A §§ 1,4; Compl. ¶ 35.)

**CNI becomes CCTS.**

On May 1, 1996, CNI changed its name to CCTS after a corporate merger with three other pre-existing companies. (Ex. B at 1, 4.) Specifically, CNI merged with Midwest Fibernet Inc., Central Communications Company, and Consolidated Communications Telecom Services Inc., with CNI surviving as the merged corporation. (Ex. B at 1.) Immediately thereafter, CNI changed its name to CCTS. (Ex. B at 4.) In particular, CNI's plan of merger provided that "Article One of the Articles of Incorporation of CNI is hereby amended to read as follows: The name of the corporation is Consolidated Communications Telecom Services Inc." (Ex. B at 4.)

**CCTS executes new 1996 Agreement, supplanting 1994 Agreement.**

On June 3, 1996, after CNI changed its name to CCTS, Champaign entered into a new ROW agreement with CCTS (the "1996 Agreement"). (Ex. C; Compl. ¶¶ 45-54.) The 1996 Agreement provided CCTS with the right to:

> construct, erect, renew, maintain and operate in, upon, along, across, under and over the streets, alleys, and public ways to the City of Champaign . . . line of poles, anchors, wires, cables, conduits, vaults, laterals and fiber optics and other fixtures and equipment (hereinafter referred to as "facilities"), and to use the same from the transmission of sounds and signals by means of

4

> electricity or light, and especially for the conduct of a general telephone business.

(Ex. C § 1.) In other words, the 1996 Agreement allowed CCTS to build and maintain conduit and equipment generally throughout Champaign's ROW for the purpose of transmitting telephone signals. In exchange for those rights, the 1996 Agreement required CCTS to pay a monthly fee to Champaign in the amount of 38 cents per "access line" — *i.e.*, for each telephone line running to a customer's home or business. (Ex. C § 6.)

The rights granted under the 1996 Agreement, and the fee mechanism imposed in the contract expressly superseded the 1994 Agreement between Champaign and the old CCTS, CNI. (Ex. C §§ 2(a), 6, 12.) In particular, the 1996 Agreement expressly applied to "existing facilities" maintained by CCTS, providing:

> The location and height above or depth below the public thoroughfares of the <u>existing facilities</u> of the Company [CCTS] within the Municipality are hereby approved, and the same shall be maintained and operated under and subject to the provisions of this Agreement[.]

(Ex. C § 2(a), emphasis added.)

Further, the parties provided that fees under the 1996 Agreement would supersede any other fees charged by Champaign:

> The payments due hereunder shall be in lieu of any permit, license, inspection or other similar fees or charges customarily assessed by the Municipality to business operating in the public way or operating in a similar business as that conducted by the Company[.]

(Ex. C § 6.)

The parties also made clear that they understood that CCTS was the corporate successor of CNI, the party to the 1994 contract, providing that:

5

> Whenever the word "Company" or the words "Consolidated Communications Telecom Services Inc." [CCTS] are used in this Agreement, they shall be constructed to mean the Consolidated Network Inc. [CNI], its lessees, <u>successors and assigns</u>.

(Ex. C § 12, emphasis added.)

**McLeodUSA acquires CCTS and enters 1997 Agreement.**

On September 17, 1997, Champaign entered into a ROW agreement ("the 1997 Agreement") with McLeodUSA's subsidiary McLeodUSA Telecommunications Services, Inc. ("MTSI"), under which MTSI agreed to pay a charge of $1.321 for the use of a specific segment of Champaign's ROW measuring 20,982 feet. (Ex. D § 1,4.) McLeodUSA constructed this network in 1997.

On September 24, 1997, a few days after the executing the 1997 Agreement, McLeodUSA acquired CCTS (Compl. ¶ 50), and on September 10, 1998 McLeodUSA merged CCTS into MTSI, with MTSI surviving as the new merged entity. (*See* Ex. E.) After the merger, CCTS no longer existed, and McLeodUSA assumed the rights and liabilities of CCTS, including the 1996 Agreement.

In August or September 1998, contemporaneous with its merger with CCTS, McLeodUSA began construction of approximately 46,500 feet of new conduit in Champaign. (Compl. ¶59.) This construction was not covered under the 1997 Agreement, which allowed McLeodUSA to use only a specific 20,982-foot segment of Champaign ROW distinct from the new construction. (Ex. D §§ 1, 4.)

**Argument**

Despite the plain language of the 1996 Agreement acknowledging the identity of CNI and CCTS and superseding the fee arrangement of the 1994 Agreement, Champaign claims that it is entitled to collect ROW fees under both agreements for the years 1998 and 2002.

Similarly, despite the express limitation of the 1997 Agreement to a specific stretch of conduit measuring 20,982 feet that McLeodUSA constructed in 1997, Champaign argues that McLeodUSA's separate 1998 construction is covered by the 1997 Agreement.

Because the plain language of the agreements contradicts Champaign's arguments, McLeodUSA anticipates that Champaign intends to introduce testimony from City Attorney Fredrick Stavins in an effort to alter the meaning of those plain terms. Thus, for example, McLeodUSA anticipates that Champaign will seek to establish through Stavins that the parties' unwritten intention was that the 1996 Agreement would not supersede the 1994 Agreement, and if the parties' intent is not reflected in the plain language of the Agreement, it is due to a clerical error. In connection with that argument, it appears that Champaign intends to proffer an exhibit (No. 28 on Champaign's Exhibit List) purporting to reflect handwritten comments on a draft of the 1996 Agreement. McLeodUSA also anticipates that Stavins may seek to testify that the parties' unwritten intention was that the 1998 construction by McLeodUSA would be covered by the 1997 Agreement, not the 1996 Agreement.

This evidence should not be admitted for at two reasons. In Part I of this memorandum, we show that because none of the terms of the agreements at issue are ambiguous, the parol evidence rule bars testimony and other evidence purporting to contradict their plain meaning. In Part II, we show that even if there were a mistake in drafting the 1996 Agreement, as Stavins may claim, it was, at most, unilateral mistake by Stavins and as such it does not affect the plain terms of the Agreement. Testimony from Stavins on any of those subjects for the purpose of contradicting the plain terms of the ROW agreement should thus be excluded under Rules 402 and 403.

**I.    This Court Should Bar Evidence Purporting to Contradict the Plain Terms of the 1996 and 1997 Agreements Because that Extrinsic Evidence on the Meaning of Unambiguous Contract Terms is Barred by the Parol Evidence Rule.**

The Court should bar Champaign from submitting evidence purporting to show that the 1996 and 1997 agreements impose on McLeodUSA obligations different from or in addition to those established by their plain terms. It is well-settled in Illinois that unambiguous contract terms must be enforced according to their terms. "Under Illinois law, resolution of issues of contract dispute starts with an analysis of the terms of the contract," and "if the language of the contract unambiguously answers the question at issue, the inquiry is <u>over</u>." *Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th 2002) (internal quotations and brackets omitted, emphasis added). If a contract is "clear and unambiguous, the parties' intent must be ascertained <u>exclusively</u> from the plain language of the contract as a matter of law." *Kaplan v. Sure Bros.*, 266 F.3d 598, 604 (7th Cir. 2001) (applying Illinois law, emphasis added). Extrinsic evidence is thus inadmissible where a contract is plain. *Young v. Allstate Ins. Co.*, 351 Ill. App. 3d 151, 157, 159, 812 N.E.2d 741, 748, 479 (1st Dist. 2004). Whether contractual terms are unambiguous is a question of law for the Court. *Kaplan*, 266 F.3d at 604.

A contract term is "ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions, and it is not ambiguous if a court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Whiting Corp. v. Prof'l Employment, Inc.*, 186 Ill. App. 3d 705, 713, 542 N.E.2d 829, 834 (1st Dist. 1989) (finding that when parties disagreed on the meaning of the term "unconditional guarantee," but the term itself was unambiguous, the dispute must be resolved by using the term's common and ordinary definition). A term is not rendered ambiguous simply because one party asserts it to be so. *Tranzact Tech. v. Evergreen Partners*, 266 F.3d 542, 548 (7th Cir. 2004).

Under those principles, the terms of the 1996 and 1997 agreements limiting McLeodUSA's financial obligations under those agreements are unambiguous, and Champaign should be barred from introducing parol evidence purporting to contradict those terms.

### A.    The 1996 Agreement Superseded the 1994 Agreement.

The 1996 Agreement expressly superseded the 1994 Agreement. It is axiomatic that where two parties reach an agreement that expressly obviates their prior agreement, the first agreement is no longer enforceable. *See, e.g., Courtois v. Millard*, 174 Ill. App. 3d 716, 720-21, 529 N.E.2d 77, 79-80 (5th Dist. 1998). Here, At least three separate unambiguous provisions of the 1996 Agreement require the same conclusion here:

*First,* section 2(a) expressly states that the 1996 Agreement covers CCTS's "existing facilities," providing that "the existing facilities of the Company within the Municipality are hereby approved, and the <u>same shall be maintained and operated under and subject to the provisions of this Agreement</u>." (Ex. C § 2(a), emphasis added.) On its face, this provision makes clear that CCTS's "existing facilities," including the telecommunications conduit covered by the prior 1994 Agreement, were now covered under the new 1996 Agreement between the same parties.

*Second*, section 6 expressly provides that CCTS shall pay Champaign only the monthly access line charge under the 1996 Agreement, and that this charge "shall be lieu of <u>any</u> permit, license, inspection or other similar fees or charges customarily assessed by the Municipality to business operating in the public way or operating in a similar business as that conducted by the Company." (Ex. C § 6, emphasis added.) There is no other way to read those plain terms than to provide that the 1996 Agreement's fee is exclusive, and that CCTS can be charged no other ROW fees by Champaign. On its face, this provision expressly supersedes fees charged to CCTS's predecessor CNI under the 1994 Agreement.

*Third*, and finally, the parties expressly acknowledged in section 12 that the terms of the 1996 Agreement would be applied to CCTS as the successor to CNI, providing that "[w]henever the word "Company" or the words "Consolidated Communications Telecom Services Inc." [CCTS] are used in this Agreement, they shall be constructed to mean the Consolidated Network Inc. [CNI], its lessees, <u>successors and assigns</u>. (Ex. C § 12, emphasis added.) The parties thus entered into the contract—including the "existing facilities" clause (section 2) and the exclusive fee arrangement (section 6)—expressly acknowledging the identity of CCTS and CNI. The plain terms of the agreement thus show that the parties expressly contemplated CCTS's successor relationship to CNI at the time of the 1996 Agreement, confirming that they intended to supersede the 1994 Agreement between CNI and Champaign.

Read together with sections 2 and 12, Section 6 unambiguously replaces any fees due under the earlier 1994 Agreement with new fees, and Champaign may not simultaneously enforce both fee provisions. *See Team Impressions v. Chromas Techs. Canada, Inc.*, No. 02 C 5325, 2003 WL 355647, at *5 (N.D. Ill. Feb. 18, 2003) (where warranty clause expressly stated it was "in lieu" of all other warranties, the parol evidence ruled barred the plaintiff from introducing an alleged additional, oral warranty); *Pennsylvania Power & Light Co. v. Joslyn Corp.,* Civ. A. No. 87-2027, 1988 WL 115773, at *4 n. 6 (E.D. Pa. Oct. 31, 1988) (same).

Because those contractual terms are plain, the City may not introduce evidence to contradict them. Indeed, Stavins *admitted* that the 1996 Agreement unambiguously encompasses both CCTS and CNI:

> Q. Okay. And so when you say this is an agreement with a different company, how does section 12 work? It seems to say that CCTS means CNI.
>
> A. Yeah, it does seem to say that.

(Ex. F, 4/14/04 Stavins Dep., at 118.) Stavins should therefore be barred from presenting any parol evidence purporting to contradict the unambiguous terms of Section 12.[2]

Nor does Stavins deny that Section 6 is unambiguous. Rather he attempts to testify to his own *new* interpretation based on not being able to recall discussions about the Section 6:

> Q. And Section 6 seems to say to me with clause that the company that's the party to the '96 agreement shall pay only under this particular agreement and that the payments shall be in lieu of any other payment.
>
> A. You know, I guess I don't look at it like that. I guess I look at it kind of forward-looking thing. There are other charges that we have, you know, potentially in the future. I didn't look at that as -- <u>at least as I sit here now</u> I don't look at it as abrogating that final charge, that other charge that we gave to them, because I'm not even sure its' the same type of business that they're using the equipment in.
>
> Q. Uh-huh.
>
> A. You know, that's what I have to say about it. So, you know, I know that you're interpreting that to somehow abrogate the old charge. I guess <u>as I sit here now</u> I don't -- I don't see that, and I don't recall any discussions concerning the abrogation of the old charge.

(Ex. F at 119-20, emphasis added.) Because it contradicts the plain language of the contract, Stavins' testimony about the parties' *possible* intent underlying the Agreement is inadmissible.

Because the City cannot show that the terms of the 1996 Agreement terminating the fees owed under the 1994 Agreement are ambiguous, any evidence Champaign seeks to introduce to contradict the plain meaning of the Agreements is barred by the parol evidence rule, and therefore inadmissible under Fed. R. Evid. 402 and 403.

---

[2] Although he admits that the plain language of Section 12 equates CNI and CCTS, Stavins later suggested that this was the result of a scrivner's error. For the reasons set forth in Part II, that is not a basis to avoid the consequences of the term's plain language.

**B.  The 1997 Agreement Does Not Apply to McLeodUSA's 1998 Construction.**

This Court should also bar Champaign from introducing parol evidence, such as testimony by Stavins, purporting to show that the 1997 Agreement applies to the 1998 construction. By its plain terms, the 1997 Agreement unambiguously applies *only* to a specific portion of Champaign's conduit that does not include the 1998 construction, and contains no term concerning any additional construction. If any contract governs the 1998 construction, it is the 1996 Agreement, which, in contrast to the 1997 Agreement, contains an express provision governing new construction.

Champaign nonetheless attempts to greatly increase the amount of ROW fees to which it is entitled by claiming that the 1998 construction is covered by the 1997 Agreement rather than the 1996 Agreement. Champaign so argues because the 1997 Agreement applies a footage charge that would increase by about $60,000 per year ($300,000 total) if applied to the construction, while the 1996 Agreement applies to access lines, not conduit footage, and thus would not necessarily result in greater fees. Because the plain terms of the contracts contradict these claims, Champaign should be barred from introducing any parol evidence in an attempt to support them.

It is fundamental that contract will not apply to issues not embraced by its subject matter. *Eichengreen v. Rollins*, 325 Ill. App. 3d 517, 524-25, 757 N.E.2d 952, 958 (1st Dist. 2001). Here, the plain terms of the 1997 Agreement apply only to a specific portion of conduit measuring 20,982 feet constructed by McLeodUSA in 1997, and do not purport to reach future construction such as McLeodUSA's 1998 project. By its plain terms, the 1997 Agreement is limited to a specific portion of McLeodUSA's network:

> *Section 1. Grant of License-Location*. For the good and valuable consideration specified herein, the Grantee is hereby given license upon the terms and subject to the conditions of this Agreement to install,

> maintain and use a conduit, buried or aerial, system ("System") above, within and under the public right-of-way <u>hereinafter specified, for a total of twenty thousand nine hundred eighty-two (20,982)</u>, on the centerline of the license.

(Ex. D § 1, emphasis added.) Nothing in the 1997 Agreement purports to apply to any portion of McLeodUSA's network other than the 20,982 feet or to any additional or future construction. Stavins even admits that 1997 Agreement does not say anything about additional construction beyond the 20,982 feet. (Ex. F at 125-27.) The contract cannot be rewritten to cover a subject the parties did not address. Because there is no ambiguity about the scope of the 1997 Agreement, Stavis should be barred for testifying that any construction beyond the 20,982 was covered by the 1997 Agreement. *E.g., Kaplan*, 266 F.3d at 604.

Indeed, In contrast to the 1997 Agreement, the 1996 Agreement *does* address future construction. The 1996 Agreement expressly authorized CCTS and its successors to "construct," "erect," and "renew" facilities in Champaign's ROW, in return for the monthly access line fee. (Ex. C § 1.) McLeodUSA succeeded to the 1996 Agreement in September 1998, contemporaneously with the 1998 construction. (Ex. E.) Thus, in the same period that it undertook the 1998 construction, McLeodUSA was contractually entitled under the 1996 Agreement to build facilities in Champaign without paying additional ROW fees. By its unambiguous terms, this contract covers McLeodUSA's 1998 ROW construction. Champaign, therefore, should not be permitted to present evidence purporting to show that the 1998 construction is covered by a different agreement.

II.   **This Court Should Bar Parol Evidence That the Term of Section 12 of the 1996 Agreement Equating CNI and CCTS was the Result of a Scrivener's Error.**

As discussed above, section 12 of the 1996 Agreement unambiguously equated the merged companies, CNI and CCTS, making clear that the parties understood that CNI had become CCTS in 1996. (Ex. C § 12.) Because that fact undermines Champaign's claims,

McLeodUSA anticipates that Champaign will argue that Section 12 of the 1996 Agreement is the result of a clerical error or unilateral mistake in interpretation. Champaign may not introduce parol evidence to attack the plain terms of the 1996 Agreement under this theory.

In his deposition, Stavins testified that he had never noticed that Section 12 equated CNI and CCTS, and Champaign's counsel suggested the mistake could have been an error.

> By Mr. Kelty:
>
> Q: Well, do you know, Fred, that in Section 12 it says that Consolidated Communications Telecom Services, Inc. means Consolidated Network, Inc?
>
> A. That's the first time I've noticed that I have to say.
>
> ….
>
> Q. Could this perhaps be a scrivener's error?
>
> ….
>
> A. Until I saw that right now, I'm moderately surprised that it said that. We were dealing with -- I don't know how that got in the agreement, frankly.

(Ex. G, 4/27/04 Stavins Dep., at 249-250.)

When pressed further on redirect examination, Stavins backed away from this theory, testifying: "As I said, I don't recall agreeing that that could be changed. I already indicated how we went over the agreement in general terms. I don't recall agreeing that that should be changed to another company. You know, could it have happened? Oh, I suppose it could have, but I don't recall agreeing to that change." (Ex. G at 325.) Stavins further admitted that he did not even read the final draft of the agreement:

> Q: Okay, and I'm asking between steps two and three, between step two where there was a final agreement with all the blanks filled and step three where it was signed by the city council, did you read the agreement?

14

> A: Did I read it all the way through? I would guess not. I would guess I looked at the front page, made sure that that was it.

(Ex. G at 318.)

This testimony forecloses any argument based on an alleged scrivener's error. "[N]egligently sign[ing] an unread document does not relieve the signed of the legal consequences of the document's contents." *Harney-Morgan Chevrolet Olds Co. v. Rabin*, 118 Ill. App. 3d 602, 607, 455 N.E.2d 130, 134 (3rd Dist. 1983) (citations omitted); *see also John J. Calnan Co. v. Talsma Builders, Inc.*, 67 Ill.2d 213, 219, 367 N.E.2d 695, 698 (1977). Because Stavins cannot even recall whether he agreed to the terms in Section 12 of the 1996 Agreement, and because Stavins admitted that he negligently failed to read the agreement before passing it along to City authorities for signature, Champaign should barred from claiming a scrivener's error to alter the plain terms of the agreement. *See Ameropan Oil Corp. v Monarch Air Service*, No. 92 C 3450, 1994 WL 86701, at **9-10 (N.D. Ill. March 16, 1994) (scrivener's error not available where the error was one of judgment); *John J. Calnan Co.* 67 Ill.2d at 219, 367 N.E.2d at 698; *see also Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1035 (7th Cir. 2000) ("Illinois flatly bars rescission on the basis of a careless mistake.") (citations omitted).

### Conclusion

For the reasons set forth above, McLeodUSA respectfully requests that this Court bar Champaign from introducing parol evidence, including evidence of a supposed "scrivener's error" to contradict the plain terms of the 1996 and 1997 Agreements, pursuant to Fed. R. Evid. 402 and 403.

        Respectfully submitted,
        McLeodUSA Incorporated and
        McLeod Telecommunications Services, Inc.


By:    s/ Edward F. Malone
        One of their attorneys
        Edward F. Malone
        Daniel J. Weiss
        JENNER & BLOCK LLP
        One IBM Plaza
        Chicago, Illinois 60611
        (312) 222-9350
        (312) 840-7517 (fax)

October 4, 2004

## CERTIFICATE OF SERVICE

      I hereby certify that on October 4, 2004, I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF McLEODUSA'S MOTION IN LIMINE NUMBER 3 TO BAR PAROL EVIDENCE with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

    Thomas W. Kelty
    tkelty@keltylaw.com

                            s/ Daniel J. Weiss
                            Edward F. Malone
                            Daniel J. Weiss
                            Attorneys for Defendants
                            Jenner & Block LLP
                            One IBM Plaza
                            Chicago, Illinois   60611
                            (312) 222-9350
                            (312) 840-7517 (fax)
                            emalone@jenner.com
                            dweiss@jenner.com