Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF ILLINOIS
 3                 URBANA/DANVILLE DIVISION
 4  ***************************
 5  THE CITY OF CHAMPAIGN, an        )
    Illinois municipal               )
 6  corporation,                     )
                                     )
 7           Plaintiff,              )
                                     )
 8                                   ) No. 02-2252
       vs.                           )
 9                                   )
    MCLEODUSA, INC., a Delaware      )
10  corporation, and MCLEODUSA       )
    TELECOMMUNICATION SERVICES,      )
11  INC., an Iowa corporation,       )
                                     )
12           Defendants.             )
13  ***************************
14        THE DISCOVERY DEPOSITION of STEPHEN D.
15  WHITSITT, reported by Becky J. Gantt, Illinois
16  CSR 084-003907 and Registered Professional
17  Reporter, on Tuesday, the 20th day of July, 2004,
18  commencing at the hour of 10:42 a.m. at the Kelty
19  Law Offices, in the City of Springfield, County
20  of Sangamon, and State of Illinois.
21
22
23
```

Page 2

```
 1  APPEARANCES:
 2      MR. THOMAS W. KELTY
            KELTY LAW OFFICES, P.C.
 3          3201 Pleasant Run, Suite A
            P.O. Box 13317
 4          Springfield, Illinois 62791-3317
            (217) 726-8200
 5          appearing on behalf
            of the Plaintiff;
 6
        MR. DANIEL J. WEISS
 7          JENNER & BLOCK, LLP
            One IBM Plaza
 8          Chicago, Illinois 60611-7603
            (312) 222-9350
 9          appearing on behalf of
            the Defendants.
10
11              I N D E X
12  WITNESS                          Page
13  STEPHEN D. WHITSITT
14    Examination by Mr. Weiss         3
      Examination by Mr. Kelty        40
15
16  EXHIBITS                         Page
17  1 - Curriculum Vitae               4
18  2 - Report                        23
19  (Original exhibits were attached to original
        trascript. Copies of the exhibits were
20        provided to Mr. Kelty.)
21
22
23
```

Page 3

```
 1             STEPHEN D. WHITSITT,
 2      having been first duly sworn on oath,
 3      was examined and testified as follows:
 4
 5                 EXAMINATION
 6  By Mr. Weiss:
 7  Q   Good morning, Mr. Whitsitt.
 8  A   Good morning.
 9  Q   My name, as you know, is Daniel Weiss. I'm a
10      lawyer from the law firm of Jenner & Block in
11      Chicago. I represent McLeodUSA in this
12      lawsuit. I understand that you have been
13      deposed before; is that right?
14  A   Yes, I have.
15  Q   Okay. And so I'll just sort of briefly run
16      through the ground rules. I'm going to ask
17      questions. You should answer to the best of
18      your ability. If anything is unclear, any of
19      my questions are unclear, let me know and
20      I'll try to clarify them.
21           If at any time you want to take a
22      break, get some water, anything at all, just
23      let me know. We can do that. And please try
```

Page 4

```
 1      and keep your answers as verbal answers
 2      rather than nodding your head or anything
 3      like that because it obviously isn't picked
 4      up on the record, okay?
 5  A   I understand.
 6  Q   Do you have any questions for me before we
 7      begin?
 8  A   No.
 9  Q   Okay. Good. Mr. Whitsitt, rather than take
10      you through a whole history of your
11      background, I would like to instead hand you
12      what has been produced to us I believe as
13      your resume. And I'll ask that this be
14      marked as Whitsitt Deposition Exhibit 1.
15          (Exhibit No. 1 marked for identification)
16  Q   And if you would just take a moment to
17      review -- for identification, there are two
18      pages titled Qualification of the Appraiser,
19      Stephen D. Whitsitt. Have you had a chance
20      to review Deposition Exhibit 1?
21  A   Yes, I have.
22  Q   And is, is Deposition Exhibit 1 a true and
23      correct copy of your current resume?
```

Page 17

1 Q Okay. The Edgebrook Property instance,
2   that's one instance where you worked for
3   somebody who was at issue with the City of
4   Champaign?
5 A They were the owner of the property the City
6   wanted to acquire.
7 Q How many instances, other instances are there
8   where you've worked for somebody who was
9   adverse to the City of Champaign over the
10  past ten years?
11 A I don't know. I'm going to guess less than a
12  dozen.
13 Q Okay. Have you ever worked with Mr. Kelty
14  before?
15 A No.
16 Q Okay. I understand that you have submitted a
17  expert report in this case; is that correct?
18 A I've given a consultation report to Mr. Kelty
19  in this case.
20 Q Okay. What question, if any, were you
21  seeking to address in your consultation
22  report?
23 A I was asked to provide an opinion regarding

Page 18

1   values of right of way areas throughout the
2   City of Champaign.
3 Q And we'll get into the details of your report
4   in a moment. But can you tell me what
5   conclusion did you reach, if any, regarding
6   the value of the right-of-way areas in the
7   City of Champaign?
8 A That the general range would be $1 to $35 per
9   square foot; the median value range would be
10  $3 to $4 per square foot; and the mean would
11  be $5 to $7 per square foot.
12 Q What methodology did you use to reach that
13  conclusion?
14 A Well, I was asked to provide my opinion,
15  which is based on a review of public records,
16  office files, discussions with realtors,
17  other appraisers -- I guess general market
18  knowledge -- MLS information.
19 Q And are those the things that you took into
20  consideration in producing your consultation
21  report?
22 A Yes.
23 Q Did you take anything else into consideration

Page 19

1   in producing your consultation report?
2 A No. I focused on the sources of data and the
3   results of that data search.
4 Q Is there a --
5 A Can I back up?
6 Q Absolutely.
7 A In formulating this opinion, I also
8   recognized that zoning has an impact on
9   value, so zoning considerations were also
10  used to formulate my opinion.
11 Q Okay. Is there a particular methodology that
12  you would consider the method that is
13  appropriate for appraisers to use in
14  evaluating property?
15 A Yes.
16 Q Does the methodology have a name?
17 A The sales comparison approach is what's
18  typically relied upon by appraisers when
19  valuing land.
20 Q And what, what does that approach entail?
21 A That approach entails identifying sales which
22  are comparable to the subject, adjusting for
23  differences, and concluding value.

Page 20

1 Q Is that the, the methodology that you used to
2   produce your report in this case?
3 A I -- I've inferred a value for the subject
4   based on competing sales. I've not performed
5   a sales comparison approach because I have
6   my -- the parameters of my assignment were to
7   recognize the value in a broad fashion for
8   all of the parcels in Champaign. So I'm
9   inferring value ranges based on competing
10  sales, which, which would ultimately form a,
11  the basis of the sales comparison approach.
12 Q So if I, if I understand here you did
13  something different than the, than the sales
14  comparison approach methodology; is that
15  right?
16 A Well, I'm using the methodology to identify
17  value ranges, but I'm not given a specific
18  parcel assignment. I'm given a broad,
19  general parcel assignment. So I don't know
20  how many parcels there are; how many
21  thousands of parcels there are around the
22  City.
23      Instead of doing multiple thousands

Page 21

1    of sales comparisons, based on my knowledge
2    of the market and analysis of data, I'm
3    inferring that the aforementioned ranges are
4    appropriate for the, for land in the City.
5 Q  Okay. I think it's -- well, let me back up.
6    You did not, in creating your report, go out
7    and look at any land, right?
8 A  No.
9 Q  Okay. And I think you just said -- but I
10   want to be sure I understand -- you don't
11   know even how many parcels there are in the,
12   in the land that your report applies to; is
13   that right?
14 A  I don't know the specific number.
15 Q  Okay. Well, aside from the specific number
16   though, do you know a general number of the
17   number of parcels that are involved in the
18   appraisal?
19 A  No.
20 Q  Okay. What, what kind of land is this that
21   we're talking about that's described in your
22   report?
23 A  I'm describing a broad cross-section of all

Page 22

1    land types by zoning classification.
2 Q  A broad cross-section of land by zoning
3    classification. What -- could you elaborate?
4 A  Well, right-of-way areas are typically
5    valued -- public roadways are typically
6    valued based on across-the-fence value or
7    what adjoining parcels are worth. That
8    covers all parcel sizes and parcel, and
9    zoning classifications. So my value opinion
10   represents that broad cross-section of land
11   types in the City.
12 Q  So let me see if I understand. You said
13   typically you value a roadway by reference to
14   what's on the sides of the roadway; is that
15   right?
16 A  Adjacent parcels are going to be -- yes,
17   that's correct.
18 Q  Okay. And so to reach the figures that are
19   in your report, you're valuing the parcels
20   that are adjacent to the, the land that's the
21   subject of the report; is that right?
22 A  That's correct.
23 Q  Okay. And the, the land that's on either

Page 23

1    side of the roadway that you're using could
2    be of any zoning type because we're not
3    talking about specific parcels, right?
4 A  That's correct.
5 Q  Okay. And so the values in your report, are
6    they essentially just the, the broad value of
7    land generally in the City of Champaign, just
8    all land?
9 A  Yes.
10 Q  And so these figures -- if somebody said what
11   is land going to run me in the City of
12   Champaign, without any more specificity as to
13   what kind or where it is or what zoning,
14   these numbers would apply, right? These
15   would be the general numbers that would
16   apply?
17 A  That's correct.
18 Q  Okay. You mentioned a little while ago the
19   conclusion in your report. And just so we're
20   all following along, I will hand you what
21   I'll have marked as Whitsitt Deposition
22   Exhibit 2.
23   (Exhibit No. 2 marked for identification)

Page 24

1 Q  And if you could hand that one to Tom. This
2    is actually your copy. Thanks.
3    Mr. Whitsitt, I'll ask you to review what's
4    been marked as Deposition Exhibit 2 and just
5    ask you if this is your consultation report
6    that you've submitted in this case?
7 A  It is.
8 Q  Okay. Now, as I understand the conclusion of
9    your report is that the value of land
10   dedicated to the right-of-way is 1 to 35
11   dollars per square foot and then you also
12   give a median and a mean value; is that
13   right?
14 A  That's correct.
15 Q  Okay. Is that -- the values we're talking
16   about, that's the purchase value of the land?
17 A  That's the unit price -- yes. That is
18   correct. If you were to purchase the
19   property, that's the unit price that you
20   would be acquiring it at.
21 Q  Okay. And just, just so I understand -- I
22   think it's obvious, but let me just ask
23   you -- when we're talking about the purchase

Page 25

1  price per square foot of land that's detailed
2  in your report, we're talking about the
3  actual, the dirt, right? I mean, I would be
4  buying a plot of land if I were buying the
5  land described in your report, right?
6  A  That's correct.
7  Q  It isn't, for example, for easements
8  underneath the land or poles running over the
9  land or any -- it's the value of the ground?
10 A  That's correct.
11 Q  Okay. And the range -- again, I'm sorry to
12 repeat -- but the range that you give is
13 between a dollar and 35 dollars per square
14 foot?
15 A  Yes.
16 Q  Okay. How, how did you derive that number?
17 I know we've talked about it a little bit,
18 but I'm wondering if you could point me to
19 any specific sources or records or anything
20 like that from which you were able to derive
21 that number?
22 A  Well, I, as a continual process, track
23 transfer declarations at the Assessor's

Page 26

1  Office and compile that information to guide
2  me in determining land values. So I have my
3  own office file of comparable sales. I'm a
4  broker and I have access to the MLS system so
5  I can access MLS records. I appraise a
6  number of subdivisions, so I have all of the
7  sales information regarding those
8  subdivisions. So those numbers reflect what
9  I've found in the marketplace based on
10 transfers of property in Champaign.
11 Q  What -- is there any specific transfer record
12 or MLS record or any, any specific document
13 that, that you refer to to generate the
14 number that's in your consultation report?
15 A  No single document.
16 Q  Okay. Well, is there any group of specific,
17 specific documents? I mean, I understand
18 that there are these MLS documents and there
19 are transfer documents. But I'm wondering if
20 you considered specific documents in putting
21 together the report?
22 A  Yes.
23 Q  And what are the specific documents?

Page 27

1  A  Well, the low end of the range would reflect
2  transfers of industrial ground or low-density
3  zoned single-family ground, residential
4  ground in lower-priced neighborhoods. The
5  high end of the range is typically going to
6  be represented by campus-oriented parcels
7  that are high-density multifamily or
8  commercial.
9  Q  And are there specific documents that would
10 show, for example, a dollar per square foot
11 or 35 dollars a square foot or is the number
12 based upon your sense of reviewing sort of
13 general transfer records and deeds and that
14 sort of thing over the years?
15 A  Well, I have -- I maintain that data. I use
16 it every day --
17 Q  Uh-huh.
18 A  -- on every assignment that I do. I have not
19 specifically pulled sales to comp out the
20 parcels within the City for this assignment.
21 I know from using those sales over and over
22 and over and over what they are and the range
23 that they fall in.

Page 28

1     I can tell you generally that Apollo
2  Subdivision in Champaign reflects an
3  industrial subdivision where land is priced
4  in the road of a dollar a square foot. I can
5  tell you that single family properties North
6  Of University Avenue on the north side of the
7  City where you find home prices in the 10 to
8  40,000 dollar price range show land sales in
9  the range of a dollar a square foot.
10    And I can tell you that land in
11 Campustown on Green Street tends to fall in
12 the low 30 dollar per square foot range, up
13 to the mid 30 dollar per square foot range
14 depending upon location and parcel size and
15 things of that nature.
16 Q  And the examples you just gave, you know of
17 those examples from your experience doing
18 your work as an appraiser, right?
19 A  That's correct.
20 Q  Not from pulling specific records for the
21 purpose of, of your report in this case,
22 right?
23 A  That's correct.

Page 29

1  Q  Okay. What sorts of things would determine
2     whether a piece of property would fall in the
3     one dollar side of things or the 35 dollar
4     side of things?
5  A  Location and zoning and parcel size.
6  Q  And what about -- well, what about if a piece
7     of property is used by multiple utilities,
8     say that there have been easements granted or
9     things like that that are part of the
10    property? How does that affect where a piece
11    of property falls in the range that you've
12    described?
13           MR. KELTY: I'm going to object
14       to the form of question. It assumes that
15       the use by utilities does affect the
16       value, and I don't think that we've heard
17       that testimony from him.
18 By Mr. Weiss:
19 Q  You can answer my question.
20 A  Well, an appraiser looks to the bundle of
21    rights. And if that bundle of rights is
22    encumbered, then theoretically the value
23    would be reduced.

Page 30

1  Q  To get back to what we were just talking
2     about, to make an assessment of whether a
3     piece of property falls on the low side or
4     the high side of the range you described, I
5     understand you would need to take into
6     consideration the specific location, the
7     specific zoning, the specific parcel size of
8     the, of the specific plot; is that right?
9  A  Those are significant factors, that's
10    correct.
11 Q  Okay. And because your report is about land
12    in general, you did not take into account any
13    of those factors for any specific piece of
14    land in creating your report, correct?
15 A  I have not been asked to value a specific
16    piece of land.
17 Q  Okay. And so you didn't take into
18    consideration in this report parcel location,
19    parcel zoning, parcel size, because you
20    didn't consider any specific parcel?
21 A  I have only in the sense that I've provided a
22    range. And that range, in my opinion, covers
23    the broad cross-section of parcels in

Page 31

1     Champaign.
2  Q  Okay. But as far as any specific location or
3     specific zoning or specific parcel size,
4     that's obviously not part of this report
5     because you haven't considered any specific
6     parcel, only a range of all locations, all
7     zoning, and all parcel sizes, right?
8  A  That's correct.
9  Q  Okay. And when we talk about rights of
10    way -- or let me strike that. When, when you
11    talk about rights of way in your report,
12    you've described roadways. Are there any
13    other types of properties that you're talking
14    about when you use the term rights of way in
15    your report?
16 A  Well, when I described roadway, I think of
17    roadways and perhaps boulevards adjacent to
18    the roadways.
19 Q  Is there anything else included in the
20    definition of rights of way that you've used
21    in your report?
22 A  I don't think so.
23           MR. WEISS: Okay. Why don't we

Page 32

1        take a break if that's okay with
2        everyone.
3            MR. KELTY: Sure.
4            (Brief Recess Taken)
5  By Mr. Weiss:
6  Q  Mr. Whitsitt, I'm done with nearly all of my
7     questions. I just wanted to hand you one of
8     the documents that was handed to me earlier
9     this morning and just ask you about it. I'm
10    not even going to bother having it entered
11    yet. Could you just tell me what, what this
12    document is? For identification it's Bate
13    stamped Champaign 2236 and it's one page.
14 A  This was a note I took in my office when I
15    first talked to Mr. Kelty regarding this
16    assignment where I was asked the broad
17    question of what are value ranges in
18    Champaign.
19 Q  Okay. And so if I, if I understand, this is
20    a note that you took on June 25th; is that
21    right?
22 A  That's correct.
23 Q  Okay. And this is when Mr. Kelty first

Page 33

1  called you; is that right? That was your
2  first call with Mr. Kelty, June 25th or
3  thereabouts?
4  A  Actually, June 22nd. I was first called by
5     Fred Stavin at the City of Champaign and
6     referred to Mr. Kelty and who he was and the
7     purpose of the call. And I'm not -- this may
8     have been our first contact. I'm not sure.
9  Q  Okay. And I'm just guessing here, but the
10    writing at the top here, Steve call Tom
11    Kelty, that's --
12 A  My secretary's.
13 Q  -- your secretary's writing? The language at
14    the bottom of the note; is that your
15    handwriting?
16 A  I'm afraid so.
17 Q  Okay. And I only ask. Are these notes you
18    took during your call with Mr. Kelty on June
19    25th?
20 A  Yes.
21 Q  Okay. And I see in the notes it looks like
22    you wrote down raw, raw value of ROW; is
23    that --

Page 34

1  A  Range of value of right of way.
2  Q  Range of value of right of way. And then you
3     have the range we've seen, 1 to 35, and a
4     median and a mean which are, which are close.
5     Median says $3 and the mean says 5 to 6
6     dollars; is that right?
7  A  That's correct.
8  Q  And why did you write that down during this
9     first call with Mr. Kelty?
10 A  Because when Mr. Kelty asked if I had an
11    opinion as to the value of the right of way
12    land, I said I did and I wrote it down so I
13    would remember what I told him.
14 Q  Okay. And were you able then to give the --
15    your opinion in this case which is present in
16    your June 25 report, were you able to give
17    Mr. Kelty the conclusion just during the
18    phone call or off the top of your head or --
19 A  When he called, that was the range that I
20    anticipated off the top of my head. He asked
21    me to provide a separate consultation report
22    which I provided. To do that, I reviewed the
23    various categories of land that I keep

Page 35

1  records of. And it, it closely matched what
2  my initial reaction was to the question.
3  Q  Okay. And, and the, the basic range though,
4     the dollar to 35 dollars, that didn't change
5     from your initial impression to your report,
6     right?
7  A  That's correct.
8  Q  Okay. Did you do anything in between the
9     time that you talked to Mr. Kelty and took
10    this note, dollar to 35 dollars, and the time
11    that you did your report to, to confirm the
12    range of a dollar to 35 dollars?
13 A  Yes.
14 Q  What did you do?
15 A  I reviewed the classifications of land that I
16    keep track of. In other words, I track land
17    by zoning. So if I review the single
18    family-zoned parcels and the commercial-zoned
19    parcels and the industrial-zoned parcels,
20    then it's going to either reinforce or not
21    reinforce my initial opinion. In this case,
22    it reinforced it. I work with them every
23    day.

Page 36

1  Q  Uh-huh.
2  A  I talk to brokers about them almost daily so
3     I have a strong sense of local values in
4     land.
5  Q  And when you say that you reviewed the zoning
6     classifications, what -- you know, in more
7     concrete terms -- does that mean? Is there
8     like a document or a chart that says zoning
9     classifications and values or something like
10    that? What does this review entail?
11 A  I have a one-page write-up or an analysis of
12    each of the transactions of land that occur
13    in the City that I feel are significant. I
14    don't have a one-page write-up on every
15    single family lot, but I have subdivision
16    reports within which I have that information.
17       If Heartland Bank buys a
18    commercial-zoned parcel of ground in the 2800
19    block of West Springfield and builds a new
20    bank, I want to have a record of that
21    purchase.
22       So I note who the -- I note the
23    location, the parcel number, grantor,

Page 37

1  grantee, recording information, date, sale
2  price, parcel size, price per square foot,
3  and then I describe what it is. I try and do
4  that on every parcel that changes hands, and
5  I review that information.
6  Q  Okay. The median and the mean values, how
7  did you come up with those, with those values
8  in your report?
9  A  Well, median meaning common.
10 Q  Uh-huh.
11 A  My thought process was that the most common
12 land, the greatest amount of land would be
13 found in residential subdivisions, which tend
14 to fall in that three to four dollar per
15 square foot range.
16        You'll find some above and some
17 below, but that's the general range you find
18 for single-family development, and that's the
19 category within which you find the most
20 parcels. That would represent the median
21 range.
22        Mean, meaning average, would be
23 higher because there are a large -- in

Page 38

1  Champaign, which is a university town, there
2  are large tracts of ground that are zoned
3  multifamily that have been densely developed
4  with apartments. The downtown area is a
5  large area that's developed with commercial
6  structures. The traffic arteries show higher
7  intensity use. All of those parcels are
8  going to skew upward that median price.
9  Q  Okay. So if I understand then, the median
10 that's in your report of 3 to 4 dollars per
11 square foot, that figure, you derived that
12 figure just from the value of single-family
13 residential zoning?
14 A  That's correct.
15 Q  Okay. And so in your report, the median
16 value of land dedicated to the public right
17 of way is 3 to $4  That, that is based wholly
18 on the range of values for single-family
19 homes?
20 A  Single family home sites --
21 Q  Okay.
22 A  -- that's correct.
23 Q  Okay. And then the average or the mean

Page 39

1  value of land dedicated to public right of
2  way, you've adjusted that figure up because
3  of -- you know that there are more valuable
4  properties in the City; is that --
5  A  Well, there are lower-valued properties as
6  well. But I think in general terms, the
7  dollar consideration you find for
8  higher-intensity use areas is going to
9  average up that range.
10 Q  Okay. The, the, the mean and the median
11 values in your report, they're not -- I think
12 from what we've been discussing -- actual,
13 you know, arithmetic calculations where you
14 tallied up rows and numbers and found a
15 scientific median and a scientific average;
16 is that right?
17 A  I have not performed a statistical analysis
18 to derive these figures.
19        MR. WEISS: Okay. That's all I
20 have subject to whatever Tom may have.
21        THE WITNESS: Okay.
22        MR. WEISS: Thank you for your
23 time.

Page 40

1
2            EXAMINATION
3  By Mr. Kelty:
4  Q  Steve, you used the term across the fence?
5  A  Yes.
6  Q  What would you mean by that?
7  A  I mean that anyone acquiring property for
8  right of way purposes pays a price
9  commensurate with what adjacent parcels are
10 worth.
11 Q  If a business contacted you and said they
12 wanted to purchase some right of way property
13 in the City of Champaign, what would your
14 first question or questions be to them?
15 A  Well, I would ask them where it is, what it
16 is, the purpose of their report, the purpose
17 of the assignment, parcel size, the zoning.
18 Q  In order to advise them of a value?
19 A  That's correct.
20 Q  You answered a question in which you made
21 reference to giving up some of the bundle of
22 rights in property?
23 A  Yes.

Page 41

1  Q    What were you getting at there?
2  A    Well, the bundle of rights allows use,
3       exclusion, disposition, various interests in
4       land. If you're going to give up some of
5       those rights, notably use, then you're
6       normally compensated for it. And depending
7       on -- well, that's what I meant by it.
8              MR. KELTY: That's all I have.
9              MR. WEISS: Okay. I think we're
10      finished with Mr. Whitsitt. So thanks
11      again for your time.
12             MR. KELTY: Steve, you're
13      entitled to read this if you want to.
14      You can't change it but you can correct
15      anything you think is incorrect.
16             THE WITNESS: I'll waive it
17      unless you think I should review it.
18             MR. KELTY: We'll waive.
19      (Signature was waived.)
20      (Deposition concluded at 11:40 a.m.)
21
22
23

Page 42

1  STATE OF ILLINOIS    )
                        ) ss.
2  COUNTY OF PEORIA     )
3       I, BECKY J. GANTT, Illinois CSR
4  084-003907 and Registered Professional Reporter,
5  do hereby certify that the foregoing is a true
6  record of the deposition of STEPHEN D. WHITSITT,
7  who was first duly sworn by me; having been taken
8  on the 20th day of July, 2004, at the Kelty Law
9  Offices, 3201 Pleasant Run, in the City of
10 Springfield, County of Sangamon, and State of
11 Illinois, in my presence, and reduced to writing
12 in accordance with my stenographic notes made at
13 said time and place.
14      I further certify that I am not a
15 relative or employee or attorney or counsel for
16 any of the parties, or a relative or employee of
17 such attorney or counsel, or financially
18 interested in said action.
19      In witness whereof, I have hereunto set
20 my hand this 23rd day of July, 2004.
21
       _____
22     Becky J. Gantt
       Illinois CSR 084-003907
23