**E-FILED**
Wednesday, 06 October, 2004  04:18:59 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA/DANVILLE DIVISION

The City of Champaign, an Illinois
Municipal corporation, on its own behalf and
On behalf of the Class of all other units of
Local government similarly situated,

       Plaintiff,

       v.

MCLEODUSA, INC., a Delaware
Corporation, and McLeodUSA
Telecommunication Services, Inc.,
An Iowa corporation,

       Defendants

No. 02-2252

Hon. Harold Baker

**Expert Report of Lynn Shishido-Topel**

## I.    Introduction

1.  I am Lynn Shishido-Topel. I hold a PhD in economics from the University of California at Los Angeles and am a Principal at Chicago Partners, LLC, an economics and accounting consulting firm. At Chicago Partners I specialize in the application of economics to legal and regulatory matters. Prior to joining Chicago Partners, I served as Commissioner on the Illinois Commerce Commission, the state agency that regulates investor-owned utilities including telecommunications services, energy services, and water supply providers in Illinois. My vita is attached as Appendix A.

2.  Chicago Partners is compensated for my time at the rate of $300 per hour. A list of the data and documents I considered for this report is attached as Appendix B.

3.  The opinions I have formed are based on my knowledge of economics and the information I have reviewed to date. Should additional material information become available, I reserve the right to supplement my report as necessary.

4.  My report is organized as follows: In Section II, I discuss my assignment and certain background facts. In Section III I summarize my opinions. In Section IV, I present my analysis.

2

## II.    Assignment and Case Background

5.  I have been asked by counsel for McLeodUSA to evaluate the opinions of Mr. David L. Clark presented in the memorandum submitted to Mr. Thomas Kelty, Esq. on June 21, 2004 ("Expert Report") and expressed in his deposition taken July 20, 2004 ("July Deposition "). I have also considered the testimony of his deposition given April 14, 2004 ("April Deposition").

6.  It is my understanding that McLeodUSA was charged a per lineal foot fee and a per access line fee to access the City of Champaign's right-of-way ("ROW") during the period 1998-2002 ("the relevant period") and that these are the fees at issue in this case. The ROW is typically space underneath or above city streets that utilities use to install services infrastructure. Various utilities, such as electric, water, and telecommunications, access the ROW for the purpose of installing or servicing utilities infrastructure.

## III.    Summary of Opinions

7.  In his report, Mr. Clark  Mr. Clark presents three opinions:

     i.    "...the average annual budget expenditure by the City of approximately \$2.8 million, increasing each year to account for inflation, reasonably reflects the City's annual expenditure for asphalt and concrete contract street maintenance." (opinion i)

     ii.    "...based on the City's costs, the per lineal foot composite fees for right-of-way use and access line use, are fair and reasonable." (opinion ii)

3

     iii.     "...for the city to maintain its roughly 220 miles of right-of-way its total annual budget of $8.4 million is approximately $7.23 per lineal foot of right-of-way, and is a reasonable calculation of cost of maintenance." (Opinion iii) (Expert Report at 1.)

8. In his July deposition, Mr. Clark provides several measures of fair and reasonable fees: 20 percent of $7.23, $2, and $5.29. He concludes that since the fee he understands was charged to McLeodUSA was equal to or less than these values, it is fair and reasonable. (July Deposition at 63-80.)

9. Based on my review of Mr. Clark's expert report and deposition testimony I have reached the following opinions:

     (1)     Mr. Clark's opinions regarding the City's costs of maintaining the ROW (opinion i and opinion iii) and his measures of fair and reasonable fees presented in his deposition testimony are unreliable and uninformative.

     (2)     Mr. Clark fails to provide a credible empirical or theoretical basis for his opinion expressed in his expert report and in deposition that the City's fees charged to McLeodUSA were fair and reasonable (opinion ii; July deposition at 63-80).

## IV.    Analysis

### A. Background on the Federal Telecommunications Act

10. It is my understanding from counsel for McLeodUSA that the City's fees were subject to the 1996 Federal Telecommunications Act ("FTA") during the relevant period. The goals of this Act were to promote

"competition among and reduce regulation of telecommunications providers". (256 F.Supp.2d 987, 2003 WL 1838767 (E.D.Mo., at 3-4.) Section 253 of this act requires that fees charged by municipalities to telecommunication service providers be fair and reasonable. (*supra* at 4.) The Federal Trade Commission and federal courts have interpreted this to mean, in the context of the FTA's goal of enhancing competition, that the fees must be directly related to the actual costs imposed by the telecommunications firm that is subject to the fee. (*supra*, at 5.)

11. There are at least three reasons why this makes economic sense in the context of the FTA.

12. First, it is reasonable that cost-causers bear the cost of their actions. Moreover, if fees are not based on the actual costs imposed by a firm, some firms will likely pay more than their costs and subsidize other firms that will pay less than their costs. Such cross-subsidization can distort competition between the firms to the detriment of consumers.

13. Second, fees in excess of actual costs can unnecessarily impede entry to the detriment of competition and the benefits to consumers provided by that competition.

14. Third, production costs of the firm paying fees in excess of actual costs will be higher than they could be. All else constant, this will either put upward pressure on the price charged to consumers, reducing sales, or put

downward pressure on the number of units the firm can profitably sell at the same price.

15. Furthermore, citizens of municipalities that charge fees in excess of actual costs may not directly enjoy the benefits of the excess fees. It is uncertain whether and how the excess fees would be distributed to the municipality's citizens.

## B. Mr. Clark's opinions regarding the City's costs of maintaining the ROW are unreliable and uninformative.

*Mr. Clark's methodology suggests a lack of understanding of the FTA and the basic economic principle of incremental costs.*

16. An economic interpretation of the FTA in this case would require evaluating whether the annual fees charged to McLeodUSA in the relevant period are directly related to the increment to annual costs *caused* by McLeodUSA during the relevant period. Mr. Clark's methodology for estimating the costs of maintaining the ROW is not geared toward an analysis consistent with the FTA. To begin with, Mr. Clark relies on data mainly outside of the relevant period for no other reason than his assumption that he should use the most recent data. (July Deposition at 31.) However, the use of these data precludes the ability to evaluate whether the fees charged to

McLeodUSA during the relevant period reflect costs caused by McLeodUSA in the relevant period.

17. Aside from being based on costs outside of the relevant time period, Mr. Clark's estimates include costs potentially caused by a multitude of activities apart from those related to the presence of McLeodUSA in the ROW . For example, it contains the personnel cost of maintaining some city vehicles, as well as the cost to assign parking tickets, costs for the re-cycling program, and costs for snowplows, road salting, and ice removal. (July Deposition at 95-104.) It also includes costs of environmental stresses and normal wear and tear unrelated to utilities. (April Deposition at 43.)

18. Further, Mr. Clark's ROW maintenance cost estimates are based on estimated annual expenditures. The levels of these expenditures may be affected from year to year by factors independent of McLeodUSA's presence in the ROW such as weather and funding levels.

19. Finally, Mr. Clark did not even consider trying to isolate the costs associated with the presence of utilities in the ROW, let alone any specific utilities. (July Deposition at 124 and 126). Mr. Clark's methodology therefore suggests a basic lack of understanding of the concept of incremental costs and the FTA. The flaws in Mr. Clark's cost estimates are described below in more detail.

*How Mr. Clark calculates the $7.23 per lineal foot estimate*

20. In his expert report and deposition testimony, Mr. Clark relies on his cost estimate of $7.23 per lineal foot to conclude that the fees charged to McLeodUSA were fair and reasonable. (July Deposition at 62-64)  Mr. Clark arrives at the per lineal foot cost with a simple calculation.  First, Mr. Clark calculates what he considers to be the total annual budget for the City to maintain the ROW ($8.4 million) by adding the estimated total general operating fund expenditures for FY02/03 of $6.1 million, to the estimated Public Works Engineering Services fund of $2.3 million for FY 03/04 . He then divides this sum by 220 miles (or 1.16 million feet).  (Expert Report Page 1)  As I discuss now, the $7.23 per foot estimate contains numerous flaws.

*Mr. Clark's estimate includes costs not related to maintaining the ROW*

21. First, Mr. Clark acknowledged that the $7.23 per foot cost contains costs that are not related to the maintenance of the city's ROW.  For example, it contains the personnel cost of maintaining some city vehicles, as well as the cost to assign parking tickets, costs for the re-cycling program, and costs for snowplows, road salting, and ice removal.  (July Deposition at 95-104).  It also includes costs of environmental stresses and normal wear and tear unrelated to utilities.  (April Deposition at 43.)

8

*Mr. Clark's estimate includes costs incurred for reasons other than repairs due to the
presence of utilities such as McLeodUSA in the ROW*

22. Second, as Mr. Clark recognizes, his cost estimates include ROW
maintenance costs incurred for a multiple of reasons other than those related
to the presence of telecommunications companies such as McLeodUSA. His
costs include for example: ordinary wear and tear from traffic and the
environment; repair of pavement cuts for city-owned utilities; and costs
incurred due to other utilities. (April Deposition at 43, 53-54, 138-139.)

23. In other words, Mr. Clark does not isolate the costs due to utilities
in general, much less the incremental costs imposed on the City by
McLeodUSA. Indeed, Mr. Clark implicitly admits this flaw: Mr. Clark
testified that he did not consider any specific utilities costs (July Deposition at
124) or what component of the cost would be caused regardless of utility
activity in the ROW (July Deposition at 126.).

*Mr. Clark's estimate does not account for the nature of one-time costs or upfront fees*

24. Third, the annual ROW fees should reflect the costs McLeodUSA
could be expected to impose on the City each year and that have not already
been paid. Mr. Clark testified in his first deposition that the costs imposed by
firms like McLeodUSA result from administering the required permit,
inspecting the firm's work on the right-of-way, inspecting the firm's repairs

of the damage caused, and long term maintenance as a result of the damages to the right-of-way. (April Deposition at 36.) Except for long-term maintenance, these costs are one-time costs. As such, it is possible that McleodUSA would not impose these costs on the City every year. Mr. Clark does not quantify these costs or account for their one-time nature in his calculations. Therefore, Mr. Clark's cost estimates cannot provide a reliable estimate of the annual costs imposed by McLeodUSA on the City of Champaign.

25. Similarly, Mr. Clark does not account for the possibility that these kinds of costs may be paid for upfront by utilities. (July Deposition at 123). In his first deposition Mr. Clark acknowledged that privately owned utilities pay the full costs to repair initial cuts made to bury their facilities. (April Deposition at 126.) Mr. Clark also testified that utilities pay a permit fee. (April Deposition at 19.) These fees should cover at least some of the costs of administering permits and inspecting the firm's work. Mr. Clark does not, however, quantify these payments or adjust his cost estimates to account for these payments.

26. Also, Mr. Clark testified that long-term maintenance, repairs to pavement and sidewalk cuts, is done on average only every 10 years. (April deposition at 126-129.) That is, a cut made by McLeodUSA in year one would require repair and maintenance in year 10, not every year. It is possible, therefore, that McLeodUSA would not impose long term maintenance costs

for all its facilities every year. Mr. Clark does not account for this possibility in his calculations.

*Mr. Clark's estimate also contains other methodological flaws*

27. Fourth, Mr. Clark's estimate contains other conceptual and methodological flaws. He does not demonstrate sufficient knowledge about the relevance, appropriateness, or accuracy of some of the underlying cost data. Because of this, Mr. Clark's use of data is also arbitrary and potentially biases his results.

28. For example, Mr. Clark uses data that do not cover the relevant time period of 1998-2002 on the basis that they are the most recent data available. (July deposition at 31.) The most recent data are not appropriate here, however, since the issue at hand is whether the fees charged McLeodUSA during the relevant period directly reflects the actual costs imposed by McLeodUSA during the relevant period. Mr. Clark provides no evidence that these cost provide an accurate estimate of the costs imposed by McLeodUSA during the relevant period.

29. Mr. Clark was aware, however, that the expenditure data that he relies on can change over time. For example, he states that costs are higher each year due to inflation. (Expert Report at 1.) Also, the data he refers to in his expert report entitled "Summary of Contract Street Maintenance Budget, Staffing and Product" show that expenditures prior to FY00/01 were lower

11

than expenditures in the later periods. Thus, since a higher cost estimate allows Mr. Clark to find higher ROW fees fair and reasonable, the use of data outside the relevant time period by Mr. Clark may bias his results in favor of finding fees to be fair and reasonable.

30. Also, Mr. Clark's cost calculations are based on total expenditures in fiscal year 2002/03 and 2003/04. The level of these expenditures can be affected from year to year by factors independent of the presence of McLeodUSA, such as weather and expected funding levels.

**C. Mr. Clark does not provide a credible basis for his opinion that the City's fees were fair and reasonable.**

31. As I discussed above, there are numerous problems with Mr. Clark's opinions regarding the annual estimate for the City's maintenance of the ROW. The inclusion of costs not related to maintaining the ROW, the inclusion of costs unrelated to utilities' presence in the ROW, the uncertainty over what costs occur annually, and potential biases in the data all also undermine Mr. Clark's opinion that the fees charged to McLeodUSA were fair and reasonable. But there are additional fundamental flaws I will now discuss.

*Mr. Clark relates the $7.23 per foot estimate to McLeodUSA without empirical support*

32. In his expert report, Mr. Clark bases his opinion that the fees the City charged to McLeodUSA were fair and reasonable on "the City's costs." But, he does not explain how the costs led him to this opinion. Further, since Mr. Clark's cost estimates are based on total maintenance costs, they do not provide any information regarding the incremental costs imposed by McLeodUSA on the City's ROW. Mr. Clark's report also does not provide a quantification of the fees he finds to be fair and reasonable.

33. After his report was filed, Mr. Clark testified in deposition regarding his definition of a fair and reasonable fee and his understanding of the fees at issue. In the July Deposition, Mr. Clark explains that his definition of a fair and reasonable fee involves "engineering feel".

34. Mr. Clark's lack of analytical compass is revealed, however, when he is asked to determine the threshold between a fair and reasonable fee and a fee that is not fair and reasonable. In his testimony, this changes from a fee that is greater than 20 percent of $7.23, to a fee that is equal or less than $2, and finally, apparently to a fee that is less than $5.29. (July Deposition at 63-80, and 127-132.)

35. Mr. Clark comes to the first threshold of 20 percent of $7.23 by noting that 20 percent of $7.23 would be a fair and reasonable fee since it is possible that McLeodUSA is in the ROW 20 percent of the time. (July deposition at 63-64.)  20 percent of $7.23 is $1.45.

36. First, there is no empirical data from Mr. Clark to support this number, just "engineering feel". Second, there is no empirical data — even if it were true that McLeodUSA was in the ROW 20 percent of the time — that it would contribute 20 percent of the annual maintenance costs. Indeed, Mr. Clark testified that it is not merely being in the ROW that affects costs to the City, but also factors such as thickness or how large the conduit is. (April Deposition at 29.)

37. In addition, "engineering feel" or not, the basis for what is fair and reasonable — the $7.23 estimate — still remains unreliable for the reasons described in Section B above. The result of applying a 20 percent factor to this cost estimate is therefore also unreliable.

*Mr. Clark's alternative estimate is also flawed*

38. At the end of the July deposition, Mr. Clark calculates a new cost estimate of $5.29 per lineal foot that apparently replaces his $2 estimate of a fair and reasonable fee. (July deposition at 132.) This cost category differs from the $8.4 million total cost estimate that generates the $7.23 cost per lineal foot estimate by excluding certain cost categories and by adding in $1.55 million in contract street maintenance expenditures. The resulting sum is divided by 220 miles of ROW to get the $5.29 cost per lineal foot estimate.

39. Mr. Clark omits some cost categories apparently in ordert to more specifically measure maintenance costs (July Deposition at 130-131.) The $5.29 cost estimates still suffers from the other flaws described above. This

14

cost estimate cannot therefore be used to evaluate whether the fees charged to McLeodUSA were fair and reasonable.

40. In any case, based on his own methodology, Mr. Clark's last minute cost calculation contradicts his opinion that the fees charged to McLeodUSA were fair and reasonable. To be consistent, Mr. Clark would have to apply the 20 percent factor to this cost estimate as he did to the $7.23 cost estimate since the $5.29 estimate continues to contain costs caused by activities unrelated to McLeodUSA.

41. When applied to $5.29, Mr. Clark's 20 percent methodology produces a fair and reasonable fee threshold of about $1. It is my understanding that the per lineal foot fees at issue in this case are $1.22 and $1.32.

*Mr. Clark's $2 threshold value is unreliable*

42. Mr. Clark apparently calculates the $2 figure as the midpoint of a range of fees established by municipalities throughout the nation that "have experienced this particular issue". (July Deposition at 73-74.)

43. Mr. Clark testified that these fees ranged from a few cents to four or five dollars, depending on the type and age of the pavement maintained. (July Deposition at 72.) Mr. Clark could not say, however, what fees would be appropriate for McLeodUSA. (July Deposition at 78-80). Since Mr. Clark cannot establish that the McLeodUSA would not qualify for fees in the lower

end of the range, the midpoint of these fees cannot be used as an estimate of a fair and reasonable fee to McLeodUSA.

44. In addition to the fact that Mr. Clark provides no empirical data that the $2 threshold value reflects the incremental costs imposed by McLeodUSA, Mr. Clark fails to provide any documentation for his $2 estimate. As a result, it is not clear whether the $2 estimate is consistent with his methodology or reliable for the purposes of this case. (July Deposition 2 at 71, 73-74.) Mr. Clark thus cannot establish that this fee is consistent with the FTA and represents a fair and reasonable cost-based fee.

45. Finally, in evaluating whether the fee McleodUSA was charged is fair and reasonable, Mr. Clark assumed that that fee is only a per lineal foot access fee of $1.00 or $1.50. (July deposition at 86.) But it is my understanding that McLeodUSA was charged was $1.22 or $1.32 per lineal foot of conduit. In addition, it is my understanding that McLeodUSA was also charged a fee per access line. The fee Mr. Clark evaluates therefore conflicts with the fees he describes in his report as "the per lineal foot composite fees for right-of-way use *and access line use...*"(Expert report at 1 (emphasis added)) and conflicts with the ROW fees at issue in this case. As a result, Mr. Clark's opinion that the City's fees were fair and reasonable is uninformative and unreliable.

Lynn Shishido-Topel

8/04/04

August 4, 2004

**APPENDIX A**

# LYNN M. SHISHIDO-TOPEL

Chicago Partners
140 South Dearborn, Suite 1500
Chicago, Illinois 60603
Telephone: (312) 251-5200
Facsimile: (312)251-5201
Mail: ltopel@chipar.com

Date of Birth:  August 15, 1951          Marital Status:  Married
Place of Birth:  Hilo, Hawaii            Citizenship:  U.S.A.

## PRESENT POSITION

CHICAGO PARTNERS

Principal and Director, Regulation Practice, (1995 to present)

## EDUCATION

Ph.D.        (Economics), University of California, Los Angeles, 1984

M.A.         (Economics), University of California, Los Angeles, 1978

B.A.         (Economics), University of Hawaii, 1974

Fields of Specialization:  Industrial Organization/Regulation, Econometrics, Finance

## PROFESSIONAL EXPERIENCE

ILLINOIS COMMERCE COMMISSION

Commissioner, (1989 - 1995)

LEXECON INC.

Senior Economist, (1979 - 1989)

UNIVERSITY OF CALIFORNIA, LOS ANGELES

Visiting Assistant Professor, Department of Economics, (1985 - 1986)

CALIFORNIA STATE UNIVERSITY, NORTHRIDGE

Lecturer, Department of Economics, (1978 - 1979)

**PROFESSIONAL EXPERIENCE (cont.)**

UNIVERSITY OF CALIFORNIA, LOS ANGELES

Teaching Associate, Department of Economics, (1975 - 1978)

**PROFESSIONAL ACTIVITIES AND AFFILIATIONS**

American Economic Association.

**TEACHING EXPERIENCE**

Microeconomic Theory (UCLA)
Industrial Organization:  Competition and Monopoly (UCLA)
Finance (CSUN)
Price Theory (CSUN)

**FELLOWSHIPS, AWARDS, PRIZES**

Hawaii Community Health Foundation Fellow, 1974 - 1975.

Foundation for Research in Economics and Education Fellow, 1974 - 1978.

Smith Richardson Dissertation Fellowship in Political Economy, 1977 - 1979.

**PUBLICATIONS**

"An Economic Analysis of Exclusive Dealing Arrangements," Ph.D.  Dissertation, University of California, Los Angeles, 1984.

**TESTIMONIAL EXPERIENCE**

Deposition of Lynn Shishido-Topel, in M.C.M. Partners, Inc. v. Andrews-Bartlett & Associates, Inc., et. al, U.S. District Court, Northern District of Illinois (Eastern Division), No. 92 C 5641 (December 5, 1996).

Prepared Rebuttal Testimony of Dr. Lynn Shishido-Topel in Atmos Energy Corporation United Cities Gas Company Joint Petition and Request for Declaratory Ruling for Approval of Merger of United Cities Gas Company into Atmos Energy Corporation and for Other Related Authority and Relief, Illinois Commerce Commission Docket No. 96-0437 (December 4, 1996).

Prepared Testimony of Lynn M. Shishido-Topel in Petition for Rulemaking on Non-Discrimination in Affiliate Transactions for Electric Utilities and Implementation of Section 16-121 of the Public Utilities Act, Illinois Commerce Commission Docket Nos. 98-0013/98-0035 (Cons.) (February 20, 1998).

Affidavit of Lynn Shishido-Topel in <u>Renee Folkerts, Amy Bonser, Individually and on Behalf of All Others Similarly Situated v. Illinois Bell Telephone Company and Ameritech Corporation</u> in the Circuit Court for the Third Judicial District, Madison County, Illinois (March 20, 1998).

Prepared Surrebuttal Testimony of Lynn M. Shishido-Topel in <u>Petition for Rulemaking on Non-Discrimination in Affiliate Transactions for Electric Utilities and Implementation of Section 16-121 of the Public Utilities Act</u>, Illinois Commerce Commission Docket Nos. 98-0013/98-0035 (Cons.) (March 20, 1998)

Affidavit of Lynn Shishido-Topel in <u>Deborah Todt, Daniel Mckay, Ella Monroe and Bonnie Mcminn, Individually and on Behalf of All Others Similarly Situated, v. Ameritech Corporation, Ameritech Services, Inc., Michigan Bell Telephone Company, Indiana Bell Telephone Company, and Wisconsin Bell, Inc.</u> in the Circuit Court for the Third Judicial District, Madison County, Illinois (April 3, 1998).

Deposition of Lynn M. Shishido-Topel in <u>Arthur A. Collins, Inc. v. Northern Telecom Limited and Northern Telecom, Inc.</u> in the United States District Court Eastern District of Virginia Alexandria Division (January 26, 1999).

Testimony of Lynn M. Shishido-Topel in <u>Michael Rumman v. Peoples Energy Services</u> before the American Arbitration Association no. 51 116 00068 01 (October 11, 2001).

March 2002

## APPENDIX B

- Opinion Report of David Clark, June 21, 2004
- Deposition of David L. Clark, The City of Champaign v. McLeodUSA, Inc. In the United States District of Illinois Urbana/Danville Division No. 02-2252 July 20, 2004.
- Deposition of David L. Clark, The City of Champaign v. McLeodUSA, Inc. In the United States District of Illinois Urbana/Danville Division No. 02-2252 April 14, 2004.
- McLeodUSA's Combined Memorandum of Law in Support of its Motion for summary Judgment and in Opposition to Champaign's Motion for Summary Judgment in the United States District Court Central District of Illinois Urbana/Danville Division No. 02-2252, November 20, 2003
- McLeodUSA's Local Rule 7.1 (D) Statement in Support of its Motion for Summary Judgment and in Response to Champaign's Motion for Summary Judgment in the United States District Court Central District of Illinois Urbana/Danville Division No. 02-2252, November 20, 2003
- FY2003/2004 Financial Plan For Community Services
- 256 F.Supp.2d 987, 2003 WL 1838767 (E.D.Mo.)
- 49 F.Supp 2d 805
- 8 F.Supp.2d 582