

# City of Champaign

**REPORT TO CITY COUNCIL**

**FROM:** Steven C. Carter, City Manager

**DATE:** August 9, 2002

**SUBJECT:** ADOPTION OF SIMPLIFIED MUNICIPAL
TELECOMMUNICATIONS TAX  SS 2002-047

**A. Introduction:** This report discusses the Simplified Municipal Telecommunications Tax, a new state tax that combines several existing telecommunications taxes, and discusses franchise and right-of-way license fees that the City currently collects from telecommunications service providers. Staff seeks Council direction on these taxes and charges.

**B. Recommended Action:** Staff recommends that the City adopt the Simplified Municipal Telecommunications Tax (STT) at the rate of 3.5%, an increase of 0.75% from its current telecommunications tax, and discontinue collecting franchise and right-of-way license fees from telecommunications service providers.  The changes would be revenue-neutral to the City.

**C. Summary:**

- In accordance with a new state law, the Simplified Municipal Telecommunications Tax (STT) will replace the City's current Telecommunications Excise Tax (TET) on January 1, 2003.  This change is mandatory. The City levies the TET at the rate of 2.75%.
- The City may adopt the STT at any rate (in one-quarter increments) up to 6%.
- The City also charges franchise and right of way license fees of $382,000 per year to telecommunications service providers that lay cable in the City's rights of way.  The City is at risk of losing these revenues in the future due to new Federal and state laws.  The $382,000 is equivalent to an STT rate of 0.75%.
- Staff proposes that the City adopt the STT at 3.5% (2.75% plus 0.75%) and discontinue charging telecommunications service providers for use of the City's rights of ways.  That change would be revenue-neutral to the City, and would preserve its revenue stream from telecommunications service providers.

**D. Background:**

**1. Background Provided in Previous Report to City Council.** Staff provided background on this subject in a Report to the City Council dated June 28, 2002. A copy of that report is attached. Therefore, this report summarizes the background information.

**2. City Telecommunications Excise Tax and Right-of-Way Agreements.** The City levies a Telecommunications Excise Tax (TET) at the rate of 2.75%, producing revenues of about $1.4 million per year. The City also has agreements with telecommunications service providers regarding use of the City's rights-of-ways. These agreements allow telecommunications service providers to lay cable in the City's rights-of-ways (ROWs). The City receives payment for the use of its ROWs through franchise fees and/or ROW license fees. The payments compensate the City for 1) continued use (rental) of its ROWs and 2) damage to the ROWs caused by work performed in them.

The system of obtaining fees from telecommunications service providers for their ROW use worked relatively well when there were one or two providers. However, the system became difficult when the telecommunications industry became deregulated and many companies could lay cable in any given area. The matter became further complicated by a new Federal law which, among other things, put municipal governments at risk regarding the collection of fees from telecommunications service providers for their use of municipal ROWs.

**3. State Adopts Simplified Municipal Telecommunications Tax.** To address these issues, the state adopted the STT earlier this year. As of January 1, 2003, the STT will replace the City's current Telecommunications Excise Tax (TET). In addition, it will replace two other taxes collected by some Illinois municipalities (but not the City), the Municipal Utility Tax on telephone use and the Telecommunications Infrastructure Maintenance Fee. Municipalities may levy the SST in one-quarter percent increments up to 6%. The new tax is called the "Simplified Tax" because it combines several existing taxes. Also the Illinois Department of Revenue will collect the tax from telecommunications service providers on behalf of all municipalities that levy the tax, and remit revenues to them. That will reduce workload for telecommunications service providers and for City staff. About 130 telecommunications service providers remit taxes to the City. About 110 of these providers remit under $5,000 per month.

**4. Effect of STT Legislation on the City of Champaign.** Effective January 1, 2003, the City's TET will convert to the STT. If the City takes no action, the tax rate will be 2.75%, the same rate as the City's current TET. Alternatively, the City could adopt the STT at a different rate. The option proposed in this report is to replace franchise and ROW license fees that the City currently charges to telecommunications service providers, by adopting the STT at a higher rate than the City's current TET rate.

**D. Alternatives:**

1. Adopt the Simplified Tax at the rate of 3.5%, and do not collect franchise and ROW fees from telecommunications service providers.

2 Adopt the Simplified Tax at the rate of 2.75%, and continue to collect existing fees.

2

### E. Discussion of Alternatives:

**Alternative 1.** The City's current franchise and ROW license agreements will expire at some point in time. Replacing those revenues with the ST would assure a continued revenue stream. Also, as noted above, Federal law now puts the City at some risk for challenges to its franchise and ROW license fees.

This approach would be revenue-neutral to the City. Under current franchise and ROW license agreements, telecommunications service providers are obligated to pay the City about $382,000 per year for use of its ROW. The fees are in addition to the 2.75% TET that providers collect from customers and remit to the City. The ROW revenues of $382,000 are equivalent to a STT rate of about 0.75%. So, instead of simply converting the 2.75% TET to a 2.75% STT, the City could add 0.75% to the STT and eliminate collection of franchise and ROW license fees from telecommunications service providers. The City's total STT rate would be 3.5% (2.75% for the current TET and 0.75% to replace current franchise and ROW license revenues).

Staff believes that this proposal would also be revenue-neutral to users of telecommunications services in Champaign. Users would pay the Simplified Tax at a rate that would be 0.75% higher than the current Telecommunications Excise Tax. However, users would no longer pay for franchise and ROW fees that the City collects from telecommunications companies with cable in the City's ROWs. State regulations allow telecommunications companies to charge costs for ROW and franchise fees to the customers of the particular municipalities that collect the fees. Staff confirmed that SBC/Ameritech charges its Champaign customers for franchise fees paid to the City by SBC. (This is listed under "Local, State and Federal Charges" on customers' SBC bills.) So, telecommunications users in Champaign would pay the same amount of fees and taxes under either alternative. The City receives over 60% of its franchise and ROW fees from SBC.

While this alternative would be revenue-neutral to the City, some telecommunications service providers would remit more to the City, and some less. Providers of local telephone service (SBC/Ameritech and McLeod) are currently obligated to pay relatively large franchise and ROW fees. While their tax collections would increase under this alternative, the increase would be less than the ROW and franchise fees that they currently pay to the City, so their total payments would decrease. Also, the City might receive no STT revenues from some telecommunications companies with cable in the City's ROWs. Those companies, known as "pass-through providers", might provide telecommunications services elsewhere in the state. But if they had no Champaign customers, they would not collect and remit STT revenues to the City.

On the other hand, many cellular and long-distance service providers own no cable in the City's ROWs and do not currently pay ROW and/or franchise fees to the City. Therefore, their payments to the City would increases under this alternative, since they would collect the additional 0.75% STT.

Under this alternative, staff proposes that the City continue to collect, from telecommunications service providers conducting work in the City's ROW, standard permit fees charged to all private parties that conduct work in the City's ROWs. The City would not replace those revenues by further increasing the rate of the STT. Staff believes that current telecommunications franchise

telecommunications franchise and ROW fees do not compensate the City for long-term damage
to its infrastructure that results from work in the City's ROWs. Continuing to assess fees for
specific permits to work in the ROWs would compensate the City for damage, and would make
the parties undertaking such work more cognizant of the cost of damage to the infrastructure.

### a. Advantages

- Assures the City of its current revenue stream.
- Reduces some accounting work for telecommunications services provides and staff.
- Simplifies any disputes with telecommunications services providers concerning amounts
  due for ROW fees, since the City would charge no fees as of January 1, 2003.
- Consistent with the intent of the state legislature in adopting the STT.
- Reduces costs for the firms' customers, since the firms would have to pay more to lay
  cable in private property, which firms would pass on through increased customer charges.

### b. Disadvantages

- Arguably, the current system of collecting franchise and ROW license fees is fairer, since
  the City would collect the fees from only those firms that have cable in the City's ROWs.

**Alternative 2.** The City could take no action, resulting in a STT rate of 2.75% (the same as the
rate of the City's current TET), and continue to collect franchise and ROW fees from
telecommunications service providers.

### a. Advantages

- May be perceived as fairer.
- Less change.

### b. Disadvantages

- Does not assure continuation of the City's current revenue stream.
- Does not simplify disputes with telecommunications services providers concerning
  amounts due for ROW fees, since the City would charge no fees as of January 1, 2003.

**F. Community Input:** Staff discussed this proposal with the Government Council of the
Champaign County Chamber of Commerce. The Council did not take a formal position on the
proposal, but several members of the Council spoke in favor it. One member expressed concern
that the proposal would confuse citizens, but recognized that the City must protect its revenues.

Staff invited comment from the companies that currently pay franchise and ROW fees to the
City. Staff also invited comment from the 18 telecommunications service providers that
individually remit over $5,000 to the City annually. (Staff saw little benefit in contacting the
companies that remit relatively low amounts to the City.) Staff received no comment except

4

from one company representative, who expressed appreciation to staff for providing information on the Simplified Municipal Telecommunications Tax, which he had not been aware of.

**G. Budget Impact:** Both alternatives are revenue-neutral in the near term. The recommended alternative would avoid possible revenue declines in the long term.

**H. Staffing Impact:** Alternative 1 would reduce workload for Finance Department staff by eliminating the receipt of franchise and ROW fees from telecommunications service providers. Usually this workload is slight, since only five companies pay the fees. However, when a company does not pay as required under agreements with the City, collection efforts for Finance, Legal, and Information Technologies staff can take entail significant workload.

Prepared by:

*Richard Schnuer*

Richard A. Schnuer
Finance Director

Attachment

J:\fin\shared\RTC 2002\Simplified Tax Study Session RTC

5

ATTACHMENT

 **ity of Champaign**

REPORT TO CITY COUNCIL

FROM:        Steven C. Carter, City Manager *Ru by plan*

DATE:        June 28, 2002

SUBJECT:     SIMPLIFIED (TELECOMMUNICATIONS) TAX LEGISLATION
             – INFORMATION ONLY

**A. Introduction:** This report provides background information that the City Council might find helpful in considering issues that will come before the Council in the near future. These issues concern payments from telecommunications companies for use of the City's rights-of-ways.

**B. Recommended Action:** This report is for information only; no Council action is recommended at this time.

**C. Background:**

**1. City Levies Municipal Utility Tax (MUT).** For many years the City has levied a 2.75% tax on utilities. This covers electric, natural gas, telephone, water and telegram services. (The City also collects a 3% cable franchise fee, but does not levy the utility tax on cable services.) State law allows municipalities to levy utility taxes up to a maximum rate of 5%. Each municipality collects its taxes from the service providers directly. Since 1997 the City has not levied the MUT on telephone services, as discussed below.

**2. Franchise and Right-of-Way Agreements.** The City has agreements with telecommunications service providers regarding use of the City's rights-of-ways. The agreements allow telecommunications service providers to lay their cable (traditional or fiber optic) in the City's rights-of-ways (ROWs). The City receives payment for the use of its ROWs through either franchise fees and/or ROW license fees. The payments compensate the City for 1) continued use (rental) of its ROWs, and 2) damage to the ROWs caused by work performed in them.

**3. City Adopts Telecommunications Excise Tax.** In 1997 the City adopted the Telecommunications Excise Tax (TET) to replace the City's municipal utility tax (MUT) on telephone services. The City took this action to increase revenues. The TET yields more revenues because it applies to a broader base than the MUT. The biggest difference is that the TET applies to out-of-state phone calls, whereas the MUT does not. The City used the revenue increase to provide part of the funding for the police facility expansion.

4. **State Adopts Telecommunications Infrastructure Maintenance Fee (TIMF).** The system of obtaining fees from telecommunications service providers for their ROW use worked relatively well when there were one or two providers. However, the system became difficult when the telecommunications industry became deregulated and many companies could lay cable in any given area. The matter became further complicated by the adoption at the Federal level of the Telecommunications Act of 1996. Among other things, the Act limited the ability of local governments to charge telecommunications service provides for use of municipal rights of ways. Therefore, municipal governments became at risk that telecommunications service providers could challenge the applicability of franchise agreements between municipalities and telecommunications service providers, particularly with respect to compensation paid to municipalities under those agreements.

Responding to these issues, the state adopted the Telecommunications Infrastructure Maintenance Fee (TIMF) to replace franchise and ROW fees paid by telecommunications services providers. (The TIMF was not intended to replace telecommunications taxes, either the MUT or TET). Under the TIMF, the compensation that municipalities were to receive from telecommunications service providers for ROW use was to be based on the sales of telecommunications services in the municipality, just like telecommunications taxes, rather than from franchise and/or ROW license fees. As enacted, the TIMF was intended to apply to all telecommunications service providers that had customers in the municipality, not just those providers that owned cable in the municipality's ROWs. Municipalities could adopt the TIMF in one-quarter percent increments, up to 1%. Adoption of the TIMF by municipalities was optional. The City of Champaign did not adopt the TIMF, and continued to collect franchise and ROW license fees.

5. **Court Invalidates Part of TIMF.** The TIMF was challenged by PrimeCo, a wireless telecommunications service provider, which stated that it should not have to pay the TIMF because PrimeCo had no cables in municipal ROWs. The court agreed and invalidated applicability of the TIMF to wireless service providers.

6. **State Adopts Simplified Tax.** In response to the court decision, the state legislature adopted a new tax called the Simplified Tax (ST) earlier this year. Its primary objective is to replace the TIMF. As a tax, instead of a fee, it applies to all telecommunications service providers, wireless or land-based. The legislature also decided to combine all telecommunications taxes (TET, MUT and Simplified Tax) into one; hence the term "Simplified Tax". Municipalities may levy the ST in one-quarter percent increments up to 6%. The 6% is comprised of the 5% maximum allowable TET or MUT, and the 1% that would have been allowable under the TIMF. The ST will take effect January 1, 2003.

7. **Revenue Collection.** The new tax is also "simplified" in that the Illinois Department of Revenue will collect it from telecommunications service providers and remit revenues to municipalities. That will provide a significant workload reduction for telecommunications service providers, many of which now make monthly payments to hundreds of Illinois municipalities. Under the ST they will make only one payment each month, to the state.

2

**D. Effect of Simplified Tax Legislation on the City of Champaign:**

**1. Tax Conversion.** Effective January 1, 2003, the City's TET will convert to the Simplified Tax. If the City takes no action, the tax rate will be 2.75%, the same rate as the City's current TET. Alternatively, the City could adopt the ST at a different rate (not exceeding 6%).

**2. Revenue Lag.** Due to the time that the state will take to process ST payments, the City will experience a three-month lag in collecting revenues from the ST. Currently there is a one-month lag from the time that telecommunications service providers collect the TET from customers to the time that the providers pay the City. So, the City's revenue lag will increase by two months.

**3. Effect of Simplified Tax on City's Current Franchise and ROW License Revenues.** The City could continue to collect revenues in accordance with its current franchise and ROW license agreements. Alternatively, the City could decide to replace franchise and ROW license revenues with revenues from the Simplified Tax. Under the City's current agreements, telecommunications service providers are obligated to pay the City about $382,000 per year. That is equivalent to a Simplified Tax rate of about 0.75%. So, the City could add 0.75 % to its Simplified Tax and eliminate collection of franchise and ROW license fees from telecommunications service providers. The City's total ST rate would be 3.5% (2.75% for the current TET and 0.75% to replace franchise and ROW license revenues).

The primary advantage of this approach is that the City's current franchise and ROW license agreements will expire at some point in time. Replacing those revenues with the Simplified Tax would assure a continued revenue stream. Also, Finance staff workload would decrease slightly. However, that is a minor consideration since the City receives only about five payments each month for franchise and ROW license fees.

Replacing franchise and ROW license fees by increasing the Simplified Tax would be "revenue-neutral" to the City. Collectively, telecommunications service providers would be obligated to pay the same amount to the City as under current practices. However, the change would not be revenue-neutral to each individual telecommunications service provider. Some firms would remit more to the City under the Simplified Tax, and some less. Many cellular and long-distance service providers own no cable in the City's ROWs and do not currently pay ROW and/or franchise fees to the City, but they would collect the additional 0.75% Simplified Tax. On the other hand, the City might receive no Simplified Tax revenues from some telecommunications companies with cable in the City's ROWs. Those companies, known as "pass-through providers", might provide telecommunications services elsewhere in the state. But if they had no Champaign customers, they would not collect and remit Simplified Tax revenues to the City.

**E. Summary:** Staff plans to bring issues related to revenues from telecommunications service providers to the City Council for its consideration in July. Staff believes that the information in this report will provide helpful background to Council in considering those matters. At this time, this report is for information only. Council Members may contact the Finance Director with any questions regarding this matter.

Prepared by:

Richard Schnuer

Richard A. Schnuer
Finance Director

J:\fin\shared\RTC 2002\Simplified Tax Memo Only

4

COUNCIL BILL NO. 96 - 125

## A RESOLUTION

### APPROVING A LETTER OF UNDERSTANDING
### AND AGREEMENT FOR USE OF THE PUBLIC WAY
### (Consolidated Communications Telecom Services Inc.)

BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF CHAMPAIGN,

ILLINOIS, as follows:

Section 1. That the "Letter of Understanding By and Between the City of

Champaign, Illinois, and Consolidated Communications Telecom Services Inc." and

"Agreement for Use of the Public Way" are hereby approved.

Section 2. That the City Manager is hereby authorized and directed to execute

the Agreements approved in Section 1 above.

Section 3. That the City Clerk is hereby authorized and directed to send two

executed copies of each Agreement approved in Section 1 above and a copy of this

Resolution to the City Attorney.

COUNCIL BILL NO. 96 - 125

PASSED:    MAY 21, 1996

APPROVED: _Samuel McCollum_
Mayor

ATTEST: _Deborah Fluck_
Deputy City Clerk

APPROVED AS TO FORM:

_Fieldd_

City Attorney

**LETTER OF UNDERSTANDING BY AND BETWEEN
THE CITY OF CHAMPAIGN, ILLINOIS, AND
CONSOLIDATED COMMUNICATIONS TELECOM SERVICES INC.**

This Letter of Understanding is intended to and shall clarify the intent of the parties to the Agreement for Use of the Public Way (Agreement) entered into between the City of Champaign (the City) and Consolidated Communications Telecom Services, Inc. (the Company), approved by the corporate authorities of the City on _____5/21/96_____, granting to the Company, its lessees, successors, and assigns certain rights in the City of Champaign, Illinois.

1.    With respect to Section 1 of the Agreement, it is the intent of the parties that the Company's right to construct, erect, renew, maintain and operate in, upon, along, across, under and over streets, alleys and public ways extends to utility easements. It is further the intent of the parties that the Agreement is limited to those streets, alleys, utility easements and public ways under the jurisdiction and control of the City. It is further the intent of the parties that the Agreement shall not be construed to deny the City the right to request an agreement for use of the public way of any legal entity to which the Company has leased or assigned its rights, or which succeeds the Company's rights.

2.    With respect to Section 2(a) of the Agreement, it is the intent of the parties that facilities installed, and all work in connection with such installation shall be performed so as not to interfere unreasonably with any utilities, lines, or cable television lines then in place, in addition to City water or sewer pipes. It is further the intent of the parties that the Company shall change its facilities so as to conform with any maintenance, repair, replacement, extension, reconstruction or enlargement of any City owned facility, in addition to the bringing to grade or change of grade, or change of width of any street or alley, and that such change to accommodate a legitimate City construction project shall be made at the Company's expense. It is further the intent of the parties that the Company shall not be required as a result of the Agreement to conform its facilities pursuant to this section due to any change of grade or width of any street or alley required by the rearrangement, separation or alteration of railroad crossings not within the jurisdiction and control of the City.

3.    With respect to Section 2(b) of the Agreement, it is the intent of the parties that each application for a permit shall be accompanied by information describing the proposed time and manner of the work, including but not limited to the manner in which lawns and grassy parkways shall be restored.

4.    With respect to Section 2(c) of the Agreement, it is the intent of the parties that if the Company fails to take protective and corrective steps within a reasonable amount of time in an emergency affecting the public health, safety and welfare, the City may take such steps as are reasonably necessary to protect public safety. The Company shall pay the City the reasonable costs incurred for such protective and corrective steps.

5.    With respect to Section 4 of the Agreement, it is the intent of the parties that the Company shall, at its own expense, indemnify and hold harmless the City and its officers, agents and employees, from liability arising, as described in that Section, out of all litigation

1

judgments or settlements, including reasonable attorney's fees and reasonable litigation and court costs.

6.    With respect to Section 6 of the Agreement, it is the intent of the parties that the Company's obligation with respect to moving customer premises wiring associated with access lines provided to the City by the Company shall relate to customer premises wiring extending from the Company's network interface to a key or PBX system, but not to the wiring of the key or PBX system itself. It is further the intent of the parties that the City shall be responsible to coordinate connection issues arising between the Company and vendors who provide PBX or key system support.

7.    With the respect to Section 10 of the Agreement, it is the intent of the parties that in the event that the Illinois Commerce Commission or any other body, board, commission or court of competent jurisdiction shall adjudge any clause of the Agreement relating to the payment of sums of money by the Company to the City as invalid or illegal, the City may terminate the Agreement and the Company shall forfeit its rights thereunder.

8.    With respect to Section 15 of the Agreement, it is the intent of the parties that if a fully signed duplicate original of the Agreement is not forwarded by the Company to the City before the end of sixty (60) days after receipt by the Company of a copy of the Agreement executed by the City, then the Agreement shall not be effective.

9.    It is the intent of the parties that, to the extent the terms of this Letter of Understanding conflict with the terms of the Agreement, the terms of the Letter of Understanding shall be controlling.

**CITY OF CHAMPAIGN, ILLINOIS**

_____
City Manager

**CONSOLIDATED COMMUNICATIONS TELECOM SERVICES INC.**

By:_____

Its:_____

ATTEST:

_____
Deputy City Clerk

By:_____

Its: Assistant Secretary & Assistant Treasurer

Dated:____6/10/96____

Dated: June 3, 1996

Approved as to Form
7 ____

2

## AGREEMENT FOR USE OF THE PUBLIC WAY

### SECTION 1.        DURATION

Consolidated Communications Telecom Services Inc., (hereinafter referred to as "the Company"), its lessees, successors and assigns, are hereby granted the right to construct, erect, renew, maintain and operate in, upon, along, across, under and over the streets, alleys and public ways of the City of Champaign (hereinafter referred to as "the Municipality"), lines of poles, anchors, wires, cables, conduits, vaults, laterals and fiber optics and other fixtures and equipment (hereinafter referred to as "facilities"), and to use the same for the transmission of sounds and signals by means of electricity or light, and especially for the conduct of a general telephone business for the period of ten (10) years from and after the effective date of this Agreement and thereafter until terminated by sixty (60) days written notice either by the Municipality to the Company, or by the Company to the Municipality. The provisions of this Agreement shall be renegotiated upon written notice from one party to the other at any time after July 1, 2000. Any new terms and conditions agreed to as a result of such renegotiation shall be effective upon the expiration of this Agreement in accordance with the terms contained herein unless the parties agree otherwise.

### SECTION 2.        EXISTING FACILITIES; PERMIT REQUIREMENTS

#### (a) Existing Facilities

The location and height above or depth below the public thoroughfares of the existing facilities of the Company within the Municipality are hereby approved, and the same shall be maintained and operated under and subject to the provisions of this Agreement. Any change in or extension of any of said facilities or the construction of any additional facilities, in, upon, along, across, under or over the streets, alleys and public ways of the Municipality shall be made pursuant to permit, as discussed in the next subsection, as issued by the Public Works Director or such officer as may be designated from time-to-time by the City Manager (or the City Manager's successor in function) of the Municipality for that purpose, (hereinafter referred to as a Municipal Telecommunications Representative or MTR). The height above public thoroughfares of all aerial wires and cables hereafter constructed shall conform to the requirements of the Illinois Commerce Commission or other regulatory body having jurisdiction thereof. All facilities hereafter installed shall be so placed, and all work in connection with such installation shall be so performed, as not to interfere unreasonably with ordinary travel on the public ways of the Municipality or with any municipal water or sewer pipes then in place, and in case of bringing to grade or change of grade, or change of width of any street or alley, the Company, provided it is notified thereof in writing at least thirty (30) days prior to the commencement thereof, shall change its facilities so as to conform thereto. The tops of all vaults constructed by the Company within the Municipality shall present an even surface with the grade at the point where laid, and shall be lowered or raised by the Company to conform to the top of paving or grade as required by the City Engineer of the Municipality whenever the grade of the street or alley in which any such vault is located may be at any time hereafter lowered or raised.

### (b) Permit Required

The construction and installation of said facilities or any change thereof including extension, reduction or removal of the facilities shall be subject to the issuance of a permit therefore by the MTR. No facility shall be laid or installed in or under any streets, alleys or other public way until a permit therefore is issued by the MTR. Said permit shall indicate the time, manner and place of laying or installing each facility. Permit approval shall be granted if the proposed work is consistent with the use of the public way granted by this Agreement. Each application for a permit shall be accompanied by prints, plans and maps showing the proposed location of each facility to be laid or installed, the location of each conduit to be entered, and the number of manholes or other openings to gain access to said conduit. In the event of an emergency which the Company believes poses a threat of immediate harm to the public or to any of the Company's facilities, the Company shall be permitted access to the public way to ameliorate the threatened harm without the benefit of a permit, provided however, the Company shall advise the Municipality of the emergency at its earliest opportunity and seek a proper permit within a reasonable period of time thereafter.

### (c) Noncompliance of Facilities

The Municipality reserves the right to make physical on-site inspections of the facilities at its discretion. The Company shall correct or substantially correct any default or nonconformance with the Municipality's written, publicly available installation standards, weather or conditions beyond the reasonable control of the Company permitting, within thirty (30) days of receipt of written notification (hereinafter "the 30 day correction period") from the MTR. If the MTR determines that the Company has not corrected or substantially corrected the default or nonconformance and has so advised the Company in writing, the Company must submit a time table within five (5) days of the lapse of the thirty (30) day correction period to the Municipality specifying the anticipated date of completion. In an emergency, affecting the public health, safety and welfare in the public way as determined by the MTR, the Company shall immediately correct the default or nonconformance. If the Municipality, in the exercise of its reasonable discretion, determines that the Company has not substantially corrected the emergency within five (5) days of such an order, the Company shall be in default and shall pay the Municipality liquidated damages of Five Hundred Dollars ($500.00) per day, each day after the five (5) day period that the Company fails to substantially correct the default or noncompliance.

### (d) Maps

Upon request by the Municipality, the Company shall file with the MTR a map which details existing and new facilities. Subject to the provisions of the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq., any maps, plans or drawings depicting Company facilities that have been properly designated "Confidential" shall be regarded by the Municipality as proprietary and confidential as to third parties. The foregoing shall not apply to any information which the Municipality can demonstrate is in the public domain through no breach of this Agreement by the Municipality. The Company and Municipality agree, to the extent practicable, to exercise their best efforts to coordinate the timing of the construction activities of each, so as to minimize any public inconvenience. On or about January 1 of each year, or as otherwise

2

agreed to by the parties, the Company shall meet with the Municipality to detail, to the extent possible, its currently planned construction activities within the Municipality.

## SECTION 3. REPAIR OF COMPANY WORK SITES

The Company, after doing any excavating or construction work shall, at its sole cost and expense, promptly repair and restore the site including all sidewalks, parkways or pavements disturbed by the Company to the condition in which it existed prior to the performance of the work, or nearly as practicable as determined by the MTR in the exercise of its reasonable discretion. In the event that any such sidewalk, parkway or pavement shall become uneven, unsettled, or otherwise requires repairing, because of such disturbance by the Company, then the Company, as soon as climatic conditions will permit, shall promptly, upon receipt of notice from the MTR so to do, cause such sidewalk, parkway or pavement to be repaired or restored to the condition in which it existed before said sidewalk, parkway or pavement was disturbed by the Company. Such restoration shall be completed within ten (10) days after the date of commencement of such restoration work. In the event that the Company fails to commence and complete the restoration work in the manner and within the time periods prescribed herein, the Municipality may, but shall have no obligation to, perform such work and recover from the Company any costs and expenses the Municipality incurs. In the event that such public way or improvement cannot be so repaired, replaced or restored, the Company shall justly compensate the Municipality. All excavations in lawns or grassy parkways shall be immediately backfilled, tamped and then restored within a reasonable time thereafter to the original condition with sod or hydroseed in accordance with the applicable provisions of this Agreement. The Company shall keep all facilities which it shall construct or repair by virtue of this Agreement, in a reasonably safe condition at all times, and shall maintain such barriers and danger signals during the construction, repair or renewal work performed hereunder as will reasonably avoid danger to life, limb and property.

## SECTION 4. DEFENSE, INDEMNIFICATION OF MUNICIPALITY

The Company shall, at its own expense, defend all suits that may be brought against the Municipality on account of or in connection with the violation by the Company of any of the obligations hereby imposed upon or assumed by it, or by reason of or in connection with any damage to life, limb or property connected with its failure to meet its obligation hereunder or any of the structures constructed or maintained by it under or by virtue of this Agreement, and hold and save the Municipality harmless from any and all liability and expense as herein defined. As used in this Section, liability and expenses shall include judgments, costs and damage for or associated with removal, relocation, alteration, repair maintenance and restoration of the structures or appliances herein authorized, and for any and all damages hereto and on account of the location, construction, alteration, repair or maintenance of any public ways, including bridges, tunnels, vaults, sewers, water mains, conduits, pipes, poles and other public utilities.

The Municipality may, under the direction of the Company or its attorneys, assist in defending any such claim or suit. The Company shall not be required to reimburse the Municipality for expenses incurred by it in case of the election so to assist.

3

The Company shall, at its own expense, indemnify and hold harmless the Municipality and its officers, agents and employees, from liability, arising out of all judgments or settlements, including reasonable attorney fees, whether for personal injury, bodily injury, property damage or loss or interruption of utility service arising out of the reconstruction, installation, maintenance or other operations of the Company.

## SECTION 5. USE OF POLES BY MUNICIPALITY

During the term of this Agreement and while the Company is using any pole or poles or conduit erected or maintained hereunder, it will permit the Municipality the use of space, if such space is not required for Company needs, for attaching the Municipality's police and fire alarm signal wires or other publicly, provided that the police and fire alarm system is provided to the public without charge. Any such attachments or use are to be in accordance with specifications designated by the Company and all work will be performed by the Municipality at its expense at the top of the space available for the use of the Company on any of said poles or conduit, it being understood that the poles upon which space is permitted for use by the Municipality shall be considered, for the purpose of this agreement, as personal property; provided that such wires shall be so placed and maintained by the Municipality that the use of the same will not interfere with the operation and maintenance of the Company's equipment or its use of said poles, and provided further that a thirty (30) inch climbing space shall be maintained between the pole pins on poles jointly used with another public utility. All such wires shall be attached and maintained under the direction and supervision of the Company's authorized representatives and only in compliance with any rules for construction and maintenance of electric power and communication lines as may be ordered by the Illinois Commerce Commission. The Municipality shall, at its own expense, defend all claims, demands, or suits on account of any injury to life, limb or property that may result by reason of or in connection with the presence, use, maintenance, erection or removal of the Municipality's wires that their appurtenances pursuant hereto, and hereby agrees to save and keep harmless the Company from any and all damages, judgments, costs and expenses of any kind which may arise by reason thereof.

## SECTION 6. COMPENSATION FOR USE OF RIGHT OF WAY

So long as the Company exercises and enjoys the rights granted to it hereunder, it shall pay to the Municipality for each Access Line that the Company maintains and operates within the Municipality: Thirty-eight Cents ($0.38) per Access Line per month  The Company shall make said payments on a monthly basis, due the last day of the succeeding calendar month. "Access Line" as used in this Section shall mean "the connecting facility between a customer's premise and the Company's serving central office that provides customer access to the dial network for placing and receiving calls." "Within the Municipality" means within the corporate boundaries of the city named in Section 1 of this Ordinance as recorded with the appropriate county recorder and as provided to the Company. The Municipality agrees to notify the Company of any ordinances annexing to or disconnecting from such corporate boundaries and agrees to provide to the Company an accurate map of such changes showing, if available, street name and number detail.

The Company agrees to provide annually, within a reasonable time from Municipality's request, the names, addresses and number of Access Lines for each of its customers within

4

the Municipality, subject to the Municipality's agreement not to disclose said information, which Municipality agrees shall be used solely for the purposes of verifying the number of the Company's Access Lines within the Municipality. The Company further agrees to substantiate, upon request the contents of such report and all records and other documents required for such verification shall, upon reasonable advance notice, be subject to inspection by the Municipality. In compiling such report, the Company shall be permitted to delete the names of those customers subscribing to the Company's non-published listing service.

The payments due hereunder shall be in lieu of any permit, license, inspection or other similar fees or charges customarily assessed by the Municipality to businesses operating in the public way or operating in a similar business as that conducted by the Company including, but not limited to, all general business license fees.

The Company shall, without charge and when directed by the City Manager of the Municipality, move within the same premises the customer premise wire associated with each Access Line provided to the Municipality by the Company, provided that not more than one such change of location in any one year per Access Line shall be made by the Company without expense to the Municipality. "Customer premise wire" is defined as any wire beginning on the customer's side of the network interface or equivalent and ending at the registration jack or connecting block, exclusive of wiring associated with key or PBX systems and their serving terminals or main distribution frames.

## SECTION 7. UNDERGROUND INSTALLATION

Newly constructed distribution lines shall be placed underground to the extent required by the Illinois Commerce Commission. The Company shall not be required to bury any existing aerial facilities. However, if a municipal construction project to the public way, such as a road widening or other improvement, would require that existing aerial facilities be relocated, the Company agrees that if requested by the Municipality, such facilities will be buried, provided the cost to the Company of burial does not exceed the cost of an aerial relocation.

If during the term of this Ordinance, the Company shall receive authority from the ICC to undertake a systemwide program or programs of undergrounding its existing transmission facilities, the Company will budget and allocate to the program of undergrounding in the Municipality such amount as may be determined and approved by the ICC.

## SECTION 8. MAINTENANCE OF TREES

The Company is authorized and directed to trim trees upon and overhanging the streets, avenues, alleys, highways and other public places or grounds of the Municipality, so as to prevent the branches of such trees from coming into contact with the wires and cables of the Company. All such trimming shall be in accordance with standard local arboricultural practices, if established. All trimming debris shall be removed from the work area on a daily basis. The Municipality may, if it so elects, specify times, methods and standards for the Company's tree trimming operations.

5

### SECTION 9. MOVING OF BUILDINGS

The Company after five (5) days written notice from the governing body of the Municipality to do so, shall remove, raise, or lower its structures temporarily to permit the moving of a building, or any other object, along a highway, provided the benefited party or parties shall agree to pay the Company an amount equal to the actual cost of effecting such temporary changes in its structures; and provided further that, pending the determination of such actual cost, the benefited party or parties shall have deposited with the Company an amount equal to the cost as estimated by the Company. Should any amount of such deposit remain unexpended, after deducting the actual cost involved, said amount shall be returned to the party making the deposit.

### SECTION 10. RIGHT TO REPEAL ORDINANCE; VALIDATION

In case the Company shall fail or neglect to comply with any or all of the provisions of this Agreement (unless by order of the Illinois Commerce Commission or of any other body, board, commission or court of competent jurisdiction, the Company is otherwise directed, or unless compliance by the Company with such provision is prohibited or adjudged unlawful by an order of the Illinois Commerce Commission or by an order of any other body, board, commission or court of competent jurisdiction), the Municipality reserves the right to terminate this Agreement and forfeit the rights hereby created or sought to be created, provided that no such repeal, rescission or forfeiture shall exist or be claimed because of such failure or neglect, until written notice of such failure or neglect so claimed shall have been given to the Company, and a reasonable opportunity afforded it to comply with the provisions hereof or to prove that such compliance already exists. In the event that the Illinois Commerce Commission or any other body, board, commission or court of competent jurisdiction shall adjudge any provision or provisions hereof invalid or illegal, or direct a change by the Company in any matter or thing herein contained, such invalidity or illegality or change shall in no way affect the remaining provisions of this Agreement, or their validity or legality and this Agreement in all other respects shall continue in full force and effect, as if said provision or provisions had not been so adjudged invalid or illegal or such change directed.

### SECTION 11. AGREEMENT NONEXCLUSIVE

Nothing contained in this Agreement shall prohibit the Municipality from entering into an agreement with any other entity similar to the one granted herein to construct, install, maintain and operate in the public way. The Municipality agrees that it will use its best efforts to obtain appropriate compensation from any and all entities that seek to use the public way to provide telecommunication services similar to the telecommunication services provided by the Company, it being the intent of the parties that all entities using the public way to provide competing services be treated fairly.

The permission and authority herein granted are not intended to limit or modify any agreement, franchise, license or permit previously granted by the Municipality to any other occupant of the public way. Therefore, the Company, recognizing the prior rights of other contractors, franchisees, licensees and permittees in the public way, shall exercise the rights granted herein in such a manner as not unreasonably to interfere with the prior or future rights of other such contractors, franchisees, licensees or permittees in the public and so as not to

6

endanger or impair the facilities of any other such contractor, franchise, licensee or permittee. The Municipality covenants that it shall require prior contractors, franchisees, licensees or permittees, in like manner, to respect the rights and not interfere with the rights of the Company granted herein.

## SECTION 12. COMPANY DEFINED

Whenever the word "Company" or the words "Consolidated Communications Telecom Services Inc." are used in this Agreement, they shall be construed to mean the Consolidated Network Inc., its lessees, successors and assigns, and this Agreement shall be binding upon and inure to the benefit of the Company, its lessees, successors and assigns.

## SECTION 13. SEVERABILITY

If any provision of this Agreement, or any covenant, stipulation, obligation, agreement, act or action, or part thereof made, assumed, entered into or taken thereunder, or any application of such provision, is for any reason held to be illegal or invalid, such illegality or invalidity shall not affect any other provision of this Agreement or any other covenant, stipulation, obligation, agreement, act or action, or part thereof, made, assumed, entered into, or taken, each of which shall be construed and enforced as if such illegal or invalid portion were not contained herein. Such illegality or invalidity of any application thereof shall not affect any legal and valid application thereof, and each such provision, covenant, stipulation, obligation, agreement, act or action, or part thereof, shall be deemed to be effective, operative, made, assumed entered into or taken in the manner and to the full extent permitted by law.

## SECTION 14. NOTICE AND MAILING OF ADDRESSES

Unless otherwise specified herein, all notices, requests, designations, deliveries, approvals, consents, demands and waivers required or provided hereunder or desired by the parties hereto shall be in writing and shall be deemed properly served if hand-delivered to the parties at the following addresses (effective on delivery) or if sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the parties at the following addresses (effective on mailing):

(i) IF TO COMPANY:               President
                                 Consolidated Communications Telecom Services Inc.
                                 121 South 17th Street
                                 Mattoon, IL  61938

                                 and

                                 Ellyn Elise Crutcher
                                 Attorney at Law
                                 121 South 17th Street
                                 Mattoon, IL  61938

7

(ii) IF TO THE MUNICIPALITY:        City Manager
                                    102 North Neil Street
                                    Champaign, IL  61820

                                    and

                                    City Attorney
                                    102 North Neil Street
                                    Champaign, IL 61820

or to such other parties at other addresses as either party may designate by notice to the other.

## SECTION 15. EFFECTIVE DATE

This Agreement shall be in full force upon receipt by the Clerk of the Municipality of the Company's written and unconditional acceptance of all the provisions of this Agreement executed by its proper officers thereunto duly authorized, under the corporate seal of the Company, and attested to by its Secretary or Assistant Secretary.

8

PASSED this _____21st_____ day of _____MAY_____, A.D. 19 96

_____
City Manager

APPROVED this_____21st_____ day of _____MAY_____, A.D. 19 96

Deborah Flick
_____
Deputy City Clerk

STATE OF ILLINOIS        )
                                        ) SS
COUNTY OF CHAMPAIGN        )

I, _____DEBORAH FLICK_____, _____DEPUTY CITY_____ Clerk of the
_____CITY_____ of _____CHAMPAIGN_____ of County,
Illinois, do hereby certify that I am the keeper of the agreements of said Municipality; and that
the above and foregoing is a true, correct and complete copy of Council Bill No. 96-125
passed by the _____CITY COUNCIL_____ of said
Municipality on the _____21st_____ day of _____MAY_____
A.D.19 96, and approved by the _____CITY COUNCIL_____ thereof on
the 21st day of _____MAY_____, A.D.19 , as appears from the records of said Municipality.

IN WITNESS WHEREOF, I have hereunto set my hand as _____DEPUTY CITY_____ Clerk
of
said Municipality and have hereunto affixed the seal thereof this _____10th_____ day of
_____JUNE_____ A.D.19 96.

Deborah Flick
_____
Deputy City                    CLERK

approved as to form
F. Coffee

9

## ACCEPTANCE BY COMPANY

Consolidated Communications Telecom Services Inc., by and through its
___President_____ and ___Asst. Secretary_____, by authority vested in
them by ___CCTS_____, do hereby unconditionally accept the foregoing
agreement for the purposes contained therein.

Accepted this 3RD day of ___June___, A.D. 1996

Consolidated Communications Telecom Services Inc.

By: _____

Its: ___President_____

ATTEST: _____

Its Assistant Secretary and
    Assistant Treasurer

STATE OF ILLINOIS    )
                     ) SS
COUNTY ___Coles_____ )

I, ___Kay A. Noeth_____, a notary public hereby certify that ___D.L. Erickson___

personally known by me to be the ___President_____ of Consolidated
Communications Telecom Services Inc., and ___K.R. Ferguson_____, personally
known by me to be the Asst. Sec. & Tres. of said company, appeared before me this
___3rd___ day of ___June_____, 1996 and acknowledge that they executed the foregoing
Acceptance on behalf of Consolidated Communications Telecom Services Inc., as their free
and voluntary act and that of the Company.

> OFFICIAL SEAL
> KAY A. NOETH
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES 3-5-2000

_____
Notary Public

**10**



**ity of Champaign**

**REPORT TO CITY COUNCIL**

**FROM:**      Steven C. Carter, City Manager $S\mathcal{C}\mathcal{C}_{\gamma_{c_8}}$

**DATE:**      May 15, 1996

**SUBJECT:**   **EXPLANATION OF COUNCIL BILL NO. 96 - 125**

**Introduction:** The Council Bill would approve an agreement between the City and Consolidated Communications Telecom Services Inc. and an associated letter of understanding for use of the City's right-of-way for the provision of telecommunication services.

**Background:** Consolidated Communications Telecom Services Inc. is a company headquartered in Mattoon. The company has been in the telephone business for 100 years. While the company has in the past laid cable through the City, it has recently requested an agreement permitting them to offer local exchange service in addition to the service it already provides. In order to accomplish this, the company has requested a right-of-way agreement similar to the agreement already in place for Ameritech. The Ameritech agreement was approved by the City Council on April 19, 1994. The agreement was negotiated through the Municipal League on a Statewide basis. The terms proposed for the agreement with Consolidated Communications are identical to the terms contained in the agreement with Ameritech, which the Council has previously approved.

The new Federal Telecommunications legislation specifies that municipalities which enter into agreements with new market enterants must do so in a non-discriminatory manner, providing the same terms and conditions to all competitors. The compensation provided under the agreement would be .38¢ per access line per month. Consolidated has entered into a similar agreement with the City of Urbana and has been marketing local exchange services in both communities.

**Alternatives:**

1.     Approve the agreement and related letter of understanding.

2.     Do not approve the letter of understanding or agreement.

**Discussion of Alternatives:** Due to the recent Federal legislation, the City really has no alternative but to approve an agreement. The terms of the agreement must be substantially the same as the agreement with Ameritech. The attached agreement fulfills that obligation. Consolidated has previously laid lines within the City and has done so in an expeditious and professional manner. They have previously paid the City for running lines within the City's right-of-way on a limited basis. There appears to be no disadvantage to approving the agreement.

Alternative 2, that is, to not approve the agreement and associated letter of understanding, would inconsistent with Federal law and the City's practice of encouraging competition. For the first time, there would be competition in local exchange service within the City. The City may well expect other telephone companies to approach the City's requesting the same authorization in the future.

**Budget and Staffing Impact**: Since the same customers within the City will be further divided between Consolidated and Ameritech, there is not expected to be any increase in revenues to the City resulting from this agreement. The City will spend time reviewing Consolidated's right-of-way activities, principally within the Engineering Division.

**Recommended Action**: Staff recommends that the Council Bill be passed approving the agreement.

Prepared by:

Frederick C. Stavins
City Attorney

FCS/sjw