E-FILED
Thursday, 14 October, 2004  07:18:50 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA/DANVILLE DIVISION

| | |
|---|---|
| THE CITY OF CHAMPAIGN, an Illinois municipal corporation, on its own behalf and on behalf of the Class of all other units of local government similarly situated, ) ) ) ) ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | NO. 02-2252 |
| MCLEODUSA, INC., a Delaware corporation, and MCLEODUSA TELECOMMUNICATION SERVICES, INC., an Iowa corporation, ) ) ) ) ) | |
| Defendants. ) | |

**CHAMPAIGN'S RESPONSE TO MCLEODUSA'S PRETRIAL MOTION
RENEWING MOTION FOR SUMMARY JUDGMENT ON DISCRIMINATION**

NOW COMES Plaintiff, THE CITY OF CHAMPAIGN, an Illinois municipal corporation, by and through its attorneys, Kelty Law Offices, P.C., pursuant to Fed. R. Civ. R. 16 and Local Rule 16.1(e), and files herewith *Champaign's Response to McLeodUSA's Pretrial Motion Renewing Motion for Summary Judgment on Discrimination*.

McLeodUSA misstates the law. Champaign may enforce against McLeodUSA a fee that is in compliance with Section 253(c) (i.e., non-discriminatory and constituting fair and reasonable compensation). Before getting to this test, however, McLeodUSA must establish that the fee being collected "may prohibit or have

the effect of prohibiting the ability of" McLeodUSA to provide long distance or local telecommunication service within the City of Champaign. See Qwest v. City of Santa Fe, 224 F.Supp.2d 1305 at 1317

When this Court denied summary judgment in its order of July 28, 2004, it based its ruling upon "insufficient evidence that McLeodUSA was the only carrier that Champaign charged multiple fees." McLeodUSA now asserts that the deposition testimony of City Attorney Stavins constitutes an admission that McLeodUSA was paying duplicate fees.

This is not the testimony whatsoever of Mr. Stavins. Section 253 of the Act (47 U.S.C. 253) preempts state and local authorities from enforcing any local ROW requirement that violates the language set forth above. The burden is upon McLeodUSA as the user to show that the fees violate Section 253 to the extent that they prohibit McLeodUSA from being competitive in the Champaign market. McLeodUSA must meet its burden of showing that the type of fees encompassed by the per lineal foot agreements have a prohibitory effect under Section 253. Only if McLeodUSA successfully meets this burden does the burden then shift to the City to establish that the fees are "fair and reasonable". See Qwest at 1317. Even if the fees are for uses that are substantially the same, this by itself would not constitute a Section 253 bar, i.e., it must prohibit McLeodUSA from competing.

The ROW charges Champaign has contracted to collect from McLeodUSA are "competitively neutral and non-discriminatory because all long distance carriers pay the per lineal foot fee and all local carriers pay the per access line fee.

"Q.  How is that price developed?

A.  Well, it was originally suggested by AT&T, when AT&T was going in.  You have to keep in context the AT&T breakup that took place in the mid '80s.  I think it was 1985.  Maybe it was effective in 1986.  Not soon after that AT&T came through and requested access to the right-of-way and suggested, suggested this price.  You know, at the time we thought it's low.  That's what I thought.  I'll tell you what I thought.  I thought, well, it's low, and then I inquired what other municipalities were charging AT&T, and we inquired from Springfield and from Bloomington I recall, and they were charging in the same vicinity, and, you know, we took it to the City Council.  The City Council discussed it.  They said, well, we were getting some other stuff from AT&T as part of this.  They were constructing, oh, several hundred new feet of sidewalk for us.  They were replacing other sidewalk that we were going to have to replace anyway in an older section of town.  So the entire deal seemed pretty reasonable to us at the time.  Once we had established a price with AT&T, there became other companies that were interested in coming through, and most companies had the notion - this is in the mid to late '80s - most companies wanted to come through very rapidly.  In other words, they were in an all-fired hurry it seemed to us. Sprint and MCI were among the companies, and we thought, well, how can we do this and be fair to everyone?  How can we have a level playing field for people who want to be in our right-of-way until we get to some other level?  In other words, we thought we could probably charge more, but we've got this -- these group of people that want to come through that seem like they want to use the right-of-way and not in an irresponsible fashion, you know, to provide services, so we hit upon this notion of, you know, let's make it easy for everyone.  Sprint is only concerned about what AT&T is paying so, you know, we said AT&T is going

to pay us $1.00 a foot with an escalator. In fact, AT&T suggested the escalator, as I recall, so everybody said yeah, sounds like a good deal. Do we have to wait?, and we said no; engineering plans approval and you can be in and out, and they were all very much in favor of that. So, all the long-line companies that we were aware of, at least that held themselves out to be long-line companies, went through the same process and all agreed to this price. That's how it was originally established. Now, during the course of that time we had discussions internally concerning -- what I said is I said, "Look. You know, $1.00 a foot seems pretty minuscule to me for a year." I mean the cost of paving a street -- you know, I don't want to repeat everything that Dave said about right-of-way, but we had at one time somebody from CERL, which is Construction Engineering Research Lab, come to speak to the City Council about this. Now he didn't produce a report for us, but he had done studies in other cities about the cost of right-of-way degradation and how this $1.00 a foot was low; in other words, that we could charge more." Stavins dep p. 46, line 14 through p. 49, line 4.

"Q. Okay. And are you saying that in each case when a carrier came in, you told the carrier you can go and use our minimum requirements statute or you can negotiate with us and you can propose anything you like and we'll consider it?

A. Yeah, yeah, that's exactly what I would have said.

Q. Okay. Would you tell those carriers, carriers that came in, about the Ameritech agreement and the terms that Ameritech was offered?

A. I would tell them about the range of agreements that we had, yeah. You know, there's nothing -- all this stuff is public record so I'd say, you know, we've got an agreement with Ameritech; we've got an agreement with AT&T, Sprint. I'd tell them everybody we had an agreement with. You know, I figured this would give them some confidence that they were dealing with somebody on a very above-board basis, yeah, so we would tell them. I'd send them copies of the agreements." Stavins dep , p. 59, line 16 through p. 60, line 11.

Also see Agreements Joint Exhibits 1 through 6.

The undisputed evidence shows that during the relevant period (1996 through 2002) Ameritech paid the $.38 per access line fee, the same as charged to McLeodUSA and other local carriers. McLeodUSA's characterization of Ameritech as the "dominant incumbent" local carrier adds nothing to the Section 253 standard.

McLeodUSA chose to acquire various companies, to rename the companies and to realign companies within its corporate structure. It knew full well when it purchased CCTS in 1996 that it intended to merge it with CNI within a short time thereafter.

> "A. No.
>
> Q. Does CNI still exist and operate as far as you know?
>
> A. It does not.
>
> Q. So it's out of business.
>
> A. Well, this -- there's a -- the short answer is it is all of the competitive phone operations that were in Champaign that did business under Consolidated Network, Inc. or other wholly-owned subsidiary companies of a company called Consolidated Communications that we purchased later were merged into McLeodUSA Telecommunications Services, Inc." (see Lazzaretti dep p. 38, lines 9-20)

Then, sometime after the effective date of the 1996 Act, McLeodUSA agreed to the payment of the additional per lineal foot fees (see 1997 Agreement, Joint Exhibit 3) in spite of the fact that it knew or should have known of its position with regard to interpretation of the now-claimed violation of the 1996 Act.

> "A.   I don't."  (See Lazzaretti dep p.82, line 1)
>
> "A.   Again, personal knowledge versus industry knowledge.  I was not here at the time so I don't know, but what was happening in the telecommunications marketplace in that period of time was that companies who had entered the market needed to build facilities as fast as possible, so that combined with I think that early on there probably was no case law guiding any interpretation of Section 253.  I think the fact of the matter is that when McLeodUSA or any telephone company approaches a city with the intent of getting into the right-of-way, the city generally says if you want to come into our right-of-way, here's what you need to do, and as a holder of a monopoly over the right-of-way, the company has no alternative but to negotiate with the city over an agreement for that access, so somehow this number was proposed and somehow this number was agreed to based upon whatever business factors or objectives were being considered at the time."  (See Lazzaretti dep p. 82, line 16 through p. 83, line 10)

Each of the three (3) agreements in question is clear by its terms that the acquiring company is assuming the rights and obligations of the original holder of the ROW rights.

McLeodUSA now argues to this Court that through its corporate acquisitions, somehow the per lineal foot charges for long distance right-of-way use has vanished in lieu of a $.38 access line charge, which by its technical definition and application can have absolutely no application to long distance service.

> "A.   I mean I know that $0.38 per access line per month is a -- I mean is a cost that rises or falls depending upon the number of customers you have, whereas the per foot charge rises or falls with the amount of facilities you place in the ground, but I don't know why the -- I'm having trouble with the foundation of the question myself because I can say that I don't know why the City employed differing structures because I wasn't there, and when I say

>that, I mean personal knowledge." (See Lazzaretti dep p. 42, lines 12-20)

The testimony of City Attorney Frederick Stavins at page 4 of McLeodUSA's *Renewed Motion* is misleading taken out of context. If the question had been "Is there a company operating in Champaign providing both local and long distance service that is paying a $.38 access line fee" then perhaps Stavins' testimony would be helpful to this Court. However, that was not the question and which he answered.

> "A. We provide a local service and we provide long distance service.
>
> Q. You provide both.
>
> A. Sure."
>
> (See Lazzaretti dep. 70, lines 5 though 8)

In conclusion for the above and foregoing reasons, McLeodUSA's *Pretrial Motion Renewing Motion for Summary Judgment on Discrimination* should be denied.

Respectfully submitted,

**THE CITY OF CHAMPAIGN, an Illinois municipal corporation, Plaintiff**

s/ Thomas W. Kelty
Thomas W. Kelty, No. 1441337
Attorneys for Plaintiff
**KELTY LAW OFFICES, P.C.**
3201 Pleasant Run, Suite A
P.O. Box 13317
Springfield, IL 62791-3317
Telephone: 217/726-8200
Facsimile: 217/726-8300
Email: tkelty@keltylaw.com

**STATE OF ILLINOIS** )
                      ) SS.
**COUNTY OF SANGAMON** )

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that on this 14th day of October, 2004, pursuant to the provisions of Rule 5 of the Federal Rules of Civil Procedure, [proposed] CDIL-LR 5.3, and the penalties therein provided, that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

        Edward F Malone, Esq.
        emalone@jenner.com

        Daniel J Weiss, Esq.
        dweiss@jenner.com

and that the original was maintained in my files.

                              s/ Thomas W. Kelty
                              Thomas W. Kelty, No. 1441337
                              Attorneys for Plaintiff
                              **KELTY LAW OFFICES, P.C.**
                              3201 Pleasant Run, Suite A
                              P.O. Box 13317
                              Springfield, IL 62791-3317
                              Telephone: 217/726-8200
                              Facsimile: 217/726-8300